**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

NICHOLE AGUANNO, CHRISTOPHER
AGUANNO,

   Plaintiffs,

   vs.

CANDLEWICK LAKE ASSOCIATION,
INC.,

   Defendant.

Case No.:  26-cv-50146

<u>**COMPLAINT**</u>

PLAINTIFFS, NICHOLE AGUANNO and CHRISTOPHER AGUANNO, by and through their attorneys, TESSA SKOGH and JESSE HODIERNE of PRAIRIE STATE LEGAL SERVICES, INC., state the following as their Complaint against Defendant:

**I. STATEMENT OF THE CASE**

1.    This is an action for injunctive relief and damages for discrimination in housing on the basis of disability. This action arises under the Fair Housing Amendments Act of 1988 (the "Fair Housing Act"), 42 U.S.C. §§3601, *et seq*., and the Illinois Human Rights Act, 775 ILCS 5/1-101, *et seq*. Defendant violated the Fair Housing Act and the Illinois Human Rights Act by refusing to grant reasonable accommodation in its rules, policies, practices, or services, when such accommodation is necessary to afford persons with disabilities equal opportunity to use and enjoy their dwelling.

<u>The Fair Housing Act</u>

2.    Under the Fair Housing Act, it is unlawful "to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of…that person." 42 U.S.C.

1

§ 3604(f)(2).  Discrimination under the Fair Housing Act includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person [with a "handicap"] equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

3.     After receiving a reasonable accommodation request, if the recipient intends to deny the reasonable accommodation, the Fair Housing Act requires it to first engage in a good faith "interactive process," during which the recipient may seek additional information.  Requests for additional information, however, cannot be used as a "ruse" to avoid or delay a reasonable accommodation request or to avoid the penalty for violating the Fair Housing Act.  *See Jankowski Lee & Assoc. v. Cisneros*, 91 F.3d 891, 895 (7th Cir. 1996).

4.     If a person's disability is obvious, or otherwise known to the recipient, and if the need for the requested accommodation is also readily apparent or known, then the recipient may not request any additional information about the requester's disability or the disability-related need for the accommodation. If the requester's disability is known or readily apparent to the provider, but the need for the accommodation is not readily apparent or known, the provider may request only information that is necessary to evaluate the disability-related need for the accommodation. *See* Joint Statement of the Department of Housing and Urban Development and the Department of Justice: Reasonable Accommodations under the Fair Housing Act, Washington, D.C., (May 17, 2004) (the "Joint Statement"), p. 12-13, *available* at:

https://www.justice.gov/sites/default/files/crt/legacy/2010/12/14/joint_statement_ra.pdf

5.     Moreover, after a reasonable accommodation has been requested, housing providers have an obligation to provide a prompt response.  As further stated by HUD and the DOJ in their Joint Statement, an "undue delay in responding to a reasonable accommodation request

may be deemed a failure to provide a reasonable accommodation." *See* Joint Statement, p. 11. The failure to make a timely determination may constitute a constructive denial of the requested accommodation. *Bhogaita v. Altamonte Heights Condo. Ass.'n, Inc*., 765 F.3d 1277, 1286 (11th Cir. 2014) (Upholding constructive denial of accommodation where the housing association failed to respond for 6 months except to request additional information).

<u>Illinois Human Rights Act</u>

6.      Because the Illinois Human Rights Act and Title VII of the Civil Rights Act of 1964 are similar and espouse the same purpose, "Illinois courts have routinely" relied upon federal law in "interpreting and determining whether discrimination has occurred." *Atkins v. City of Chicago Com'n on Human Relations*, 281 Ill.App.3d 1066, 1074 (1st Dist. 1996).

7.      The Illinois Human Rights Act states it is a civil rights violation to "refuse to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 775 ILCS 5/3-102.1(c)(2).

## II.  JURISDICTION AND VENUE

8.      This Court has jurisdiction of the action pursuant to 42 U.S.C. §1331.

9.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367.

10.      Pursuant to 28 U.S.C. §1391, venue is proper as a substantial part of the acts or omissions giving rise to this action occurred in Boone County, Illinois, the real property involved in the action is located in Boone County, Illinois, and Defendant's principal location and most significant contacts are in Boone County, Illinois.

### III.  PARTIES

11.     Plaintiffs, Nichole Aguanno ("Nichole") and Christopher Aguanno ("Christopher"), are adult residents of the real property and premises located at 227 Picadilly Drive SE, Poplar Grove, Illinois 61065 (the "Home").

12.     Plaintiffs, Nichole and Christopher, have four minor children who also reside at the Home, including A.A. and V.A.

13.     Defendant, Candlewick Lake Association, Inc. ("Defendant"), is a general not-for-profit corporation organized under the laws of the State of Illinois with a registered address of 13400 IL Route 76, Poplar Grove, Illinois 61065.

14.     The Defendant is the homeowner's association that governs the "Candlewick Lake" development.

### IV.  FACTUAL ALLEGATIONS

15.     Nichole and Christopher have lived in their Home with their minor children for approximately 2 years.

16.     The Plaintiffs' Home is located within "Candlewick Lake," which is a homeowners association development governed by the Defendant.

#### The Candlewick Lake Association

17.     The Defendant operates pursuant to the "Bylaws of Candlewick Lake Association Inc.," which were recorded in the Boone County Recorder's Office as document number 2014R01941.

18.     The Defendant also operates pursuant to its "Covenants, Conditions, and Restrictions" ("CCR's"), which were recorded in the Boone County Recorder's Office as document number 2014R00769.

19.     The Defendant also operates pursuant to separate "Environmental Control Committee Building Rules and Regulations" ("ECC Rules") approved by the Board of Directors of the Defendant.

20.     The Defendant has also developed a subdivision called "Savannah Oaks of Candlewick" ("Savannah Oaks"), which operates pursuant to its own "CCR's" and "ECC Rules" approved by the Board of Directors of the Defendant.

21.     The Defendant's CCR's state:

> *In order to preserve the natural quality and aesthetic appearance of the existing geographic areas in the Development, all property lines shall be kept free and open one to another and no fences shall be permitted on any Lot or Lot lines except where, in the opinion of the Environmental Control Committee, a fence or other enclosure, as a structure or aesthetic feature of a design concept, will contribute to and be in keeping with the character of the area. In such cases, the Committee shall determine the size, location, height, and composition of the fence or other enclosure.*

22.     The Defendant's ECC Rules state:

> *Fences are not allowed in Candlewick Lake, except upon application and approval according to the CC & R's, Section II, Paragraph C: Fences. In order to preserve the natural quality and aesthetic appearance of the existing geographic areas within the Development, all property lines shall be kept free and open one to another and no fences shall be permitted on any lot or lot lines except where, in the opinion of the Environmental Control Committee, a fence or other enclosure, as a structure of aesthetic feature of a design concept, will contribute to and be in keeping with the character of the area. In such cases, the Committee shall determine the size, location, height and composition of the fence or other enclosure.*

23.     The Savannah Oaks CCR's and ECC Rules each state:

> *In order to preserve the natural quality and aesthetic appearance of the existing geographic areas within the Development, all property lines shall be kept free and open one to another and no fences, decorative or otherwise, shall be permitted on any lot or lots.*

The Aguanno Family

24.     Nichole and Christopher have four children who reside with them in their Home, including five-year-old twin boys, A.A. and V.A.

25.     Both A.A. and V.A. have been diagnosed with autism spectrum disorder.

26.     The diagnosed autism spectrum disorder substantially limits one or more major life activities for both A.A. and V.A., including but not limited to communicating, social interactions, learning, concentrating, and similar activities.

27.     As a result of their disabilities, A.A. and V.A. are mostly non-verbal.

28.     As a result of their disabilities, A.A. and V.A. have limited safety awareness and are unable to understand the property boundaries of the Home.

29.     As a result of their disabilities, A.A. and V.A. have eloped and frequently attempt to elope from the property boundaries of the Home.

30.     As a result of their disabilities, A.A. and V.A. have eloped and attempted to elope into the street and into other residents' yards, at least one of which contains a swimming pool.

31.     As a result of their disabilities, A.A. and V.A. are more likely to run away (i.e., "elope"), if not closely supervised.

32.     As a result of their disabilities, A.A. and V.A. experience communication deficits and would be unable to tell an adult that they are lost or need help.

33.     As a result of the tendency of A.A. and V.A. to elope, Nichole and Chrisotpher, and their minor children, are unable to fully utilize their backyard as a family, including as a play space for A.A. and V.A. and their other children.

34.     Nichole and Christopher each experience fear, anxiety, panic, and emotional distress over the safety of A.A. and V.A. related to their eloping behaviors.

6

35. For instance, Nichole and Christopher have taken steps to secure their Home with additional locks and other security measures.

36. Additionally, Nichole and Christopher have created and circulated posters with their contact information and photos of A.A. and V.A. in fear that the children would elope and become lost.

<u>Reasonable Accommodation Request</u>

37. On June 30, 2025, Nichole and Christopher sent a multi-page letter to the Defendant requesting a reasonable accommodation (the "Reasonable Accommodation Request") to permit the construction of a fence in the backyard of their Home due to A.A. and V.A.'s diagnosed disabilities and related symptoms and behaviors, including eloping. A true and correct copy of the Reasonable Accommodation Request is attached as **Exhibit A**.

38. The Reasonable Accommodation Request specifically cited the Fair Housing Act and other authoritative sources.

39. The Reasonable Accommodation Request included extensive detail about A.A. and V.A.'s disabilities and was supported by medical evidence, including information and diagnostic criteria for Autism Spectrum Disorder from the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders Volume 5 (DSM-V).

40. The Reasonable Accommodation Request specifically included three letters of support from mental health and medical professionals directly familiar with A.A. and V.A. and Autism Spectrum Disorder.

41. In the letters of support, the treatment providers recommended that Nichole and Christopher be allowed to build a fence for safety reasons related to A.A. and V.A.'s disabilities.

42. For instance, the letter of support from the children's Senior Therapist stated that A.A. and V.A. are "more likely to dangerously elope," citing statistics and professional studies. The same Senior Therapist cited specific examples of A.A. and V.A.'s eloping behavior and supported the reasonable accommodation request to ensure the Plaintiffs are able to "play freely in their yard" while ensuring "their safety from eloping."

43. In another letter of support, the children's pediatrician requested "an exemption … to approve a fence for the safety of my patients" due to their "Autism diagnosis with a high risk of elopement."

44. In the third letter of support, the children's Board Certified Behavior Analyst and License Behavior Analyst supported installation of a fence, citing again specific data for the children's disabilities, in order to allow the children play outside and still "remain safe."

45. Without modification, the Defendant's prohibition against fences causes harm to A.A. and V.A. as a result of their disabilities.

46. Installation of a fence in the Home's backyard would ameliorate some of the effects of A.A.'s and V.A.'s disabilities by allowing them and other family members to play safely outside at the Home.

47. Installation of a fence in the Home's backyard would also reduce the supervision required and emotional distress and worry experienced by Nichole and Christopher.

48. The Reasonable Accommodation Request provided ample information to establish that A.A. and V.A. have a disability and that the need to install a fence is related to the children's disability.

49. The Reasonable Accommodation Request also provided four sample fence designs and an aerial view of the Home proposing the fence's location in the backyard.

8

50. The Reasonable Accommodation Request also provided signatures from several close neighbors who support installation of a fence for the safety and welfare of A.A. and V.A.

51. The Defendant initially responded to the Reasonable Accommodation Request and acknowledged that Nichole and Christopher had provided sufficient evidence of the medical diagnoses for A.A. and V.A. A true and correct copy of the Defendant's initial response is attached as **Exhibit B**.

52. In its initial written response, the Defendant stated the Nichole and Christopher had "provided sufficient evidence regarding the children's medical diagnosis," and yet the Defendant still demanded "more information/evidence" to "justify the right to have a fence."

53. In its initial written response, the Defendant demanded that Nichole and Christopher justify their requested accommodation by establishing a record to show that installing a fence would accomplish their proposed objectives and demonstrating how allowing a fence in this case would not be detrimental to the Candlewick Lake development as a whole.

54. On October 17, 2025, Nichole and Christopher sent another written letter, through legal counsel, explaining that the Plaintiffs had established the children's disability and clear disability-related need to install a fence as a reasonable accommodation and again requesting the Defendant approve the Reasonable Accommodation Request and requesting that Defendant respond by October 31, 2025. A true and correct copy of this letter is attached as **Exhibit C**.

55. On November 19, 2025, the Defendant responded again claiming that Nichole and Christopher had "presented insufficient evidence to the ECC to establish *a right* to a reasonable accommodation for a fence under the circumstances." A true and correct copy of this letter is attached as **Exhibit D**.

56. In its response dated November 19, 2025, despite the ample information previously provided to the Defendant in the initial Reasonable Accommodation Request and subsequent letter, the Defendant still claimed that Nichole and Christopher had failed to "offer a sufficient foundation of evidence to establish a right to this requested accommodation."

57. In its response dated November 19, 2025, the Defendant again demanded that Nichole and Christopher provide even more evidence and details to convince it that the Plaintiffs are entitled to construct a fence as a reasonable accommodation.

58. Namely, the Defendant demanded unnecessary information such as "renderings or mockups" of what the fence would "look like to neighboring properties."

59. On December 1, 2025, Nichole and Christopher responded through counsel with the additional information requested by Defendant and requested that Defendant respond by December 10, 2025. A true and correct copy of this letter is attached as **Exhibit E**.

60. On December 22, 2025, the Defendant responded, stating that it "accepts [Plaintiffs'] statements and the evidence they provided that the basis for the request to construct a fence is reasonably related to the stated disability." A true and correct copy of this letter is attached as **Exhibit F**.

61. Yet, in its response dated December 22, 2025, the Defendant demanded additional details, including the number of feet the fence would be located away from the dwelling and property lines, the exact height of the fence, the materials, the color, whether the fence will be see-through, the name of the contractor constructing the fence, and additional aesthetic information.

62. On February 27, 2026, Nichole and Christopher sent a response to the Defendant providing all information that the Defendant requested, including materials from a professional fencing contractor, two design options for the Defendant to choose which aesthetic it preferred,

10

three-dimensional renderings of the proposed fence, and top-down plot-plan showing exact dimensions of the proposed fence and property line. A true and correct copy of this letter is attached as **Exhibit G**.

63. In their letter dated February 27, 2026, Nichole and Christopher confirmed that they would even be willing to remove the fence in the future if the conditions necessitating it no longer existed.

64. In their letter dated February 27, 2026, Nichole and Christopher requested that the Defendant respond by March 13, 2026.

65. As of the date of filing of this complaint, the Defendant has not responded to the letter dated February 27, 2026.

66. As of the date of filing of this complaint, the Defendant has failed and/or refused to grant the Reasonable Accommodation request for over 9 months.

67. The Defendant has repeatedly delayed approval of the Reasonable Accommodation Request by repeatedly requiring Nichole and Christopher to provide more aesthetic details about the fence.

68. The Defendant has failed to respond to any of the letters sent by Nichole and Christopher in a timely fashion or by the requested deadlines.

69. The Defendant has instead repeatedly required additional aesthetic details under the guise of an "interactive process" when such information was not necessary to establish the children's disability nor the disability-related need for a fence.

70. The Defendant has already admitted that the children, A.A. and V.A., have a disability and that the installation of a fence is reasonably related to the stated disability.

71. Defendant failed to participate in good faith in an interactive process by obstructing and delaying the request for an accommodation.

72. Defendant's undue delay in responding to the Reasonable Accommodation Request and Defendant's ongoing demands for information that is duplicative or unnecessary to establish the children's disability or the disability-related need for a fence caused a breakdown in the interactive process.

Injury to Plaintiffs

73. Defendant's refusal to approve the Reasonable Accommodation Request constitutes a denial or constructive denial of the request.

74. Defendant's refusal to approve the Reasonable Accommodation Request timely has caused damages to Plaintiffs.

75. Defendant's refusal to approve the Reasonable Accommodation Request timely has compounded and perpetuated Plaintiffs' limited ability to safely use and enjoy their Home, including their backyard.

76. Despite Plaintiffs submitting the Reasonable Accommodation Request originally in June 2025, Defendant's undue delay and unnecessary, duplicative requests caused Plaintiffs the missed opportunity to construct a fence in 2025 as, on information and belief, an adequate fence was not able to be constructed for many additional months due to winter weather conditions.

77. Despite Plaintiffs submitting the Reasonable Accommodation Request originally in June 2025, Defendant's undue delay and unnecessary, duplicative requests caused Plaintiffs the missed opportunity to construct a fence and thereby further deprived A.A. and V.A. and the family the opportunity or ability to use and enjoy their backyard for several additional months.

78. Despite Plaintiffs submitting the Reasonable Accommodation Request originally in June 2025, Defendant's undue delay and unnecessary, duplicative requests caused Plaintiffs damages as, on information and belief, costs of labor and materials continue to increase.

79. Defendant's refusal to approve the Reasonable Accommodation Request timely has prevented the Plaintiffs and their children from enjoying their backyard, including the inability to play or exercise outdoors, without the attendant safety concerns that A.A. and V.A. may elope or be unsafe or injured.

80. Defendant's refusal to approve the Reasonable Accommodation Request timely has caused Nichole and Christopher to experience ongoing emotional distress, worry, fear, anxiety, panic, difficulty focusing, and trouble sleeping, as they fear without a fence A.A. and V.A. will elope into dangerous situations such as a busy street or neighboring pool.

81. Defendant's CCR's allow fences when approved for "aesthetic and/or design purposes."

82. Other fences or similar structures already exist on other properties within the "Candlewick Lake" association.

83. Defendant's concerns focus largely on the appearance of the fence's aesthetics rather the applicable fair housing laws or the health and safety of the Plaintiffs and their children.

84. Defendant's disregard for the law and the health and safety of the Plaintiffs and their children constitutes a reckless disregard of their rights.

85. As described above, Defendant acted intentionally and with willful, wanton, and reckless disregard for Plaintiffs' rights guaranteed by federal and state fair housing laws.

## V.  CAUSES OF ACTION

### COUNT I

<u>Violations of the Federal Fair Housing Act</u>

1-85.   Plaintiffs reincorporate and re-allege paragraphs 1-85 of the previous sections as if fully stated and alleged as paragraphs 1-85 herein.

86.   Defendant's conduct as described herein violates the Fair Housing Act.

87.   There is an actual controversy between the Plaintiffs and the Defendant; and it is appropriate to declare the rights and other legal relations of the parties pursuant to 28 U.S.C. §2201.

88.   A preliminary and permanent injunction requiring Defendant to terminate a discriminatory housing practice and to affirmatively take action to comply with the Fair Housing Act is authorized pursuant to 42 U.S.C. §3613(c)(1).

89.   A preliminary and a permanent injunction directing the Defendant to allow the Plaintiffs to construct and maintain a backyard fence are appropriate because:

   a. Plaintiffs have a substantial likelihood of success on their legal claims against the Defendant;

   b. Plaintiffs do not have an adequate remedy at law and will suffer irreparable harm. While Plaintiffs are seeking damages, such damages are not an adequate remedy to address the ongoing denial of their right to use and enjoy their backyard in the same way as families who do not have children with significant disabilities. The minor Plaintiffs will not have a second chance to enjoy these years of their childhood;

   c. The Defendant will not suffer any irreparable harm because the fence can be removed if they ultimately prevail on the merits;

   d. It is in the public interest to require homeowners associations to comply with the law, including the Fair Housing Act and to reasonably modify their policies when

necessary to provide an equal housing opportunity to children with disabilities and their families.

90.     Defendant's above-described actions caused damage to Plaintiffs.

**WHEREFORE**, Plaintiffs respectfully requests that this Court:

A.  Enter a declaratory judgment holding that Defendant violated the Fair Housing Act by strictly enforcing the restrictive covenants and denying Plaintiffs a reasonable accommodation;

B.  Enter a preliminary and permanent injunction ordering Defendant to allow construction of an appropriate fence on the Plaintiffs' property pursuant to 42 U.S.C. §3613(c)(1);

C.  Order Defendant to take appropriate affirmative action to prevent violations of the Fair Housing Act pursuant to 42 U.S.C. §3613(c)(1);

D.  Award Plaintiffs actual and punitive damages pursuant to 42 U.S.C. §3613(c)(1);

E.  Award Plaintiffs reasonable attorney's fees and costs pursuant to 42 U.S.C. §3613(c)(2); and,

F.  Grant such additional and further relief as this court deems just and proper.

**COUNT II**

Violations of the Illinois Human Rights Act

1-90.     Plaintiffs reincorporate and re-allege paragraphs 1-90 of Count I as if fully stated and alleged as paragraphs 1-90 herein.

91.     Because the Illinois Human Rights Act and Title VII of the Civil Rights Act of 1964 are similar and espouse the same purpose, "Illinois courts have routinely" relied upon federal law in "interpreting and determining whether discrimination has occurred." *Atkins v. City of Chicago Com'n on Human Relations*, 281 Ill.App.3d 1066, 1074 (1st Dist. 1996).

15

92. The Illinois Human Rights Act states it is a civil rights violation to "refuse to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 775 ILCS 5/3-102.1(c)(2).

93. Defendant's above-described actions violate the Illinois Human Rights Act.

94. Defendant's above-described actions caused damage to Plaintiffs.

**WHEREFORE**, Plaintiffs respectfully requests that this Court:

A. Enter a declaratory judgment holding that Defendant violated the Illinois Human Rights Act by strictly enforcing the restrictive covenants and denying Plaintiffs a reasonable accommodation;

B. Enter a preliminary and permanent injunction ordering Defendant to allow construction of an appropriate fence on the Plaintiffs' property pursuant to 775 ILCS 5/10-102(c)(1);

C. Order Defendant to take appropriate affirmative action to prevent violations of the Illinois Human Rights Act pursuant to 775 ILCS 5/10-102(c)(1);

D. Award Plaintiffs actual and punitive damages pursuant to 42 U.S.C. §3613(c)(1);

E. Award Plaintiffs reasonable attorney's fees and costs pursuant to 775 ILCS 5/10-102(c)(2); and,

F. Grant such additional and further relief as this court deems just and proper.

16

## VI.  <u>DEMAND FOR A JURY TRIAL</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all issues.


Respectfully submitted,


/s/ Tessa Skogh
Tessa Skogh, Attorney
Bar No. 6342744
Prairie State Legal Services, Inc.
303 N Main St, Ste 600
Rockford, IL 61101
Phone: (815) 965-2902
tskogh@pslegal.org


/s/ Jesse Hodierne
Jesse Hodierne, Managing Attorney
Bar No. 6309254
Prairie State Legal Services, Inc.
303 N Main St, Ste 600
Rockford, IL 61101
Phone: (815) 965-2902
jhodierne@pslegal.org

*Attorneys for Plaintiffs*

# Exhibit A

Nichole & Christopher Aguanno
2277 Picadilly Drive Southeast
Candlewick Lake
Poplar Grove, 61065
847.890.3240

June 30th, 2025

Dear Candlewick Lake Board Members,

I would like to introduce myself. My name is Nichole Aguanno. Myself, my husband Christopher, and our four children reside in Candlewick Lake Board Association at 227 Picadilly Drive Southeast and have enjoyed living here for two years. We are writing to the board today to request a reasonable accommodation under the United States Department of Justice Fair Housing Act (See *Appendix A*) to install a fence on our property for the safety of our two sons who are medically diagnosed with Autism Spectrum Disorder Level 2/3. Please consider our family's story as we strive to create a safe, functional and enriching environment for our children.

We purchased our home a little over two years ago for the purpose of living in a safe, gated, protected and beautiful community for our family to grow in. There was no way we could have known our that our family would grow to include two amazing twin boys, A████ and V████, with Autism. A diagnosis of Autism Spectrum Disorder, as defined by the American Psychiatric Association (APA) Diagnostic and Statistical Manual of Mental Disorders Volume 5 (DSM-V), is a neurological and developmental disorder that affects how people interact with others, communicate, learn, and behave (Centers for Disease Control and Prevention, 2024). Level 2/3 Autism Spectrum Disorder entails labeling individuals as *"Requiring Substantial Support.* Individuals at this level experience marked deficits in verbal and nonverbal social communication skills. Social impairments are noticeable even with support in place, and there is limited initiation of social interactions. Repetitive behaviors and interests may also be present, causing noticeable interference with daily functioning" (Autism Speaks, 2013). Please see Appendix B for full diagnostic description of Autism Spectrum Disorder.

Unfortunately, among other things, we assumed we would teach our kids the boundaries of our yard like all of the other neighborhood kids and with this diagnosis we are unable to do that, nor are A████ and V████ able to currently comprehend us doing so. Along with this has come many challenges with eloping, which means to run from a safe place, running into the street, and taking off fast most of the time in opposite directions. We have learned children with Autism Spectrum Disorder have a "fight or flight" response when

overwhelmed, overstimulated or even excited, which may bypass their rational mind, and moves them right into flight mode. When this happens, they may run faster than normal, have no concern for their safety other than getting away, act impulsively and/or irrationally even. Quickly we realized we are in it for the long haul when it comes to their safety, and we have taken every precaution within our control to ensure their safety including installing hard to open door locks and door alarms, extra gates up between our kids and our front door, and motion detection cameras. We are doing everything possible to ensure our house is a safe as possible so A█████ and V█████ don't slip out during our crazy family chaos, or during the night. Unfortunately, completely moving is not a feasible option for our family at this time, nor is there a desire to leave Candlewick.

As we currently have A█████ and V█████ in a 40 hour a week Applied Behavior Analysis under the treatment of a Board Certified Behavior Analysis who is working with the boys to develop safety awareness, our next step is to include the backyard into all of our safety procedures for our home. A█████ and V█████ are 4 year old rambunctious, energetic and active little boys who thrive outside in the natural environment for many reasons. The natural environment calms them and soothes their overstimulated minds. Being outside allows them to ground their hyperactive bodies at the same time as releasing all of that energy. Due to their high level of need for safety, the last two summers spending time outside has been, quite frankly, absolute nightmares in attempting to keep A█████ and V█████ within the boundaries of our own yard for their safety. As parents, this has become our full time job in nice whether and redirecting them to safety is how we spend 90% our family time outside. This has significantly impacted our quality of family life and we are desperately seeking to improve this.

Some of our greatest concerns with their safety include our neighbors yards. Although our neighbors have been so amazing about keeping extra eyes out and have been understanding about our boys running on their properties, but we feel like we are putting them in a difficult position and feel like an imposition. Our immediate next-door neighbor has a boat trailer and another small trailer in the back of his property lot along with a mower and some other expensive equipment that A█████ and V█████ constantly fixate on (perseveration is a characteristic of Autism Spectrum Disorders). We are worried about them hurting themselves on it and worry about them damaging our neighbor's property despite his grace to our family.

Last summer, our neighbors two doors down from us built a pool. Our worst fear that we didn't even know existed came to life and now we have to keep them safe from not only streets, cars, equipment, but a pool. As nice as our neighbors are they have mistakenly left the ladder down a few times with no one in or around the pool. Their simple mistake could cost the life of any neighborhood child.

We have dived deep into the world of ASD and have learned some very alarming statistics in regards to safety and children with ASD. The CDC states, 1 in 31 children are diagnosed with Autism Spectrum Disorder (Centers for Disease Control and Prevention, 2025). The National Autism Association states 49% of children with Autism Spectrum Disorder attempt to elope from a safe environment. Of those who elope, 53% go missing long enough to cause concern. **Drowning is a significant risk, accounting for <u>91%</u> of deaths in Autistic children 14 and under who elope**. One-third of children with autism who wander/elope are never or rarely able to communicate their name, address, or phone number. The last one which kills me as a parent to two children with autism...children with autism are **160 times as likely to die from drowning** as the general pediatric population (*A Resource Provided by the National Autism Association*, 2011).

Each member of this association is entitled to have whatever approved equipment, pools, playgrounds, etc. in their yards and we are not asking for any of that to be changed. We are asking for a change to our specific circumstances to allow greater safety for all that may be impacted by our very special boys and not having a fence considering all of this information, is unsafe. We have considered our current reality of keeping our boys inside since they are unable understand safety concepts or when we only have one adult home at a time, however, along with decreasing their quality of life, doing this feels inhumane. The Universal Declaration of Human Rights Article 13; Section 1 states, "Everyone has the right to freedom of movement and residence within the borders of each state" (United Nations, 1948).

We ask you as neighbors, friends, community and the village it takes to raise up our newest generation to please help us as parents try to protect our children. Please help us keep our A███████ and V██████ from ever being one of these devastating statistics. We know this is a big ask considering Candlewicks by-laws, rules, and traditions, but we are asking to be an exception to a rule, a medical exemption out of a medical necessity.

Publish our story, spread awareness, and please just kindly consider this from loving neighbors who are trying to do the best for our children with different needs.

We have attached several things to this letter to help you in your consideration of our request:

·Appendix A- *United States Department of Justice Fair Housing Act- Disability Portion*

·Appendix B- *American Psychiatric Association (APA) Diagnostic and Statistical Manual of Mental Disorders Volume 5 (DSM-V) Diagnostic Criteria Autism Spectrum Disorder*

·*Signatures of supportive surrounding neighbors*

·*Pictures of proposed possible fence varieties*



Thank you for your consideration and your time today. Thank you for creating such a beautiful and safe community to a raise a family.

All our Thanks,

Nichole & Christopher Aguanno



*Appendix A*

*United States Department of Justice Fair Housing Act- Disability Portion*

The Fair Housing Act, 42 U.S.C. 3601 et seq., prohibits discrimination by direct providers of housing, such as landlords and real estate companies as well as other entities, such as municipalities, banks or other lending institutions and homeowners insurance companies whose discriminatory practices make housing unavailable to persons because of:

- race or color
- religion
- sex
- national origin
- familial status, or
- disability.

Discrimination in Housing Based Upon Disability

The Fair Housing Act prohibits discrimination on the basis of disability in all types of housing transactions. The Act defines persons with a disability to mean those individuals with mental or physical impairments that substantially limit one or more major life activities. The term mental or physical impairment may include conditions such as blindness, hearing impairment, mobility impairment, HIV infection, mental retardation, alcoholism, drug addiction, chronic fatigue, learning disability, head injury, and mental illness. The term major life activity may include seeing, hearing, walking, breathing, performing manual tasks, caring for one's self, learning, speaking, or working. The Fair Housing Act also protects persons who have a record of such an impairment, or are regarded as having such an impairment. Current users of illegal controlled substances, persons convicted for illegal manufacture or distribution of a controlled substance, sex offenders, and juvenile offenders are not considered disabled under the Fair Housing Act, by virtue of that status. The Fair Housing Act affords no protections to individuals with or without disabilities who present a direct threat to the persons or property of others. Determining whether someone poses such a direct threat must be made on an individualized basis, however,

and cannot be based on general assumptions or speculation about the nature of a disability. The Division's enforcement of the Fair Housing Act's protections for persons with disabilities has concentrated on two major areas. One is insuring that zoning and other regulations concerning land use are not employed to hinder the residential choices of these individuals, including unnecessarily restricting communal, or congregate, residential arrangements, such as group homes. The second area is insuring that newly constructed multifamily housing is built in accordance with the Fair Housing Act's accessibility requirements so that it is accessible to and usable by people with disabilities, and, in particular, those who use wheelchairs. There are other federal statutes that prohibit discrimination against individuals with disabilities, including the Americans with Disabilities Act, which is enforced by the Disability Rights Section of the Civil Rights Division.

*Updated June 22, 2023*

*Appendix B*

*American Psychiatric Association (APA) Diagnostic and Statistical Manual of Mental Disorders Volume 5 (DSM-V) Diagnostic Criteria Autism Spectrum Disorder*

**A. Persistent deficits in social communication and social interaction across multiple contexts, as manifested by the following, currently or by history (examples are illustrative, not exhaustive, see text):**

1. Deficits in social-emotional reciprocity, ranging, for example, from abnormal social approach and failure of normal back-and-forth conversation; to reduced sharing of interests, emotions, or affect; to failure to initiate or respond to social interactions.

2. Deficits in nonverbal communicative behaviors used for social interaction, ranging, for example, from poorly integrated verbal and nonverbal communication; to abnormalities in eye contact and body language or deficits in understanding and use of gestures; to a total lack of facial expressions and nonverbal communication.

3. Deficits in developing, maintaining, and understanding relationships, ranging, for example, from difficulties adjusting behavior to suit various social contexts; to difficulties in sharing imaginative play or in making friends; to absence of interest in peers.

**Specify current severity:** Severity is based on social communication impairments and restricted repetitive patterns of behavior.

**B. Restricted, repetitive patterns of behavior, interests, or activities, as manifested by at least two of the following, currently or by history (examples are illustrative, not exhaustive; see text):**

1. Stereotyped or repetitive motor movements, use of objects, or speech (e.g., simple motor stereotypies, lining up toys or flipping objects, echolalia, idiosyncratic phrases).

2. Insistence on sameness, inflexible adherence to routines, or ritualized patterns or verbal nonverbal behavior (e.g., extreme distress at small changes, difficulties with transitions, rigid thinking patterns, greeting rituals, need to take same route or eat food every day).

3. Highly restricted, fixated interests that are abnormal in intensity or focus (e.g, strong attachment to or preoccupation with unusual objects, excessively circumscribed or perseverative interest).

4. Hyper- or hyporeactivity to sensory input or unusual interests in sensory aspects of the environment (e.g., apparent indifference to pain/temperature, adverse response to specific sounds or textures, excessive smelling or touching of objects, visual fascination with lights or movement).

Specify current severity: Severity is based on social communication impairments and restricted, repetitive patterns of behavior.

**C. Symptoms must be present in the early developmental period (but may not become fully manifest until social demands exceed limited capacities or may be masked by learned strategies in later life).**

**D. Symptoms cause clinically significant impairment in social, occupational, or other important areas of current functioning.**

**E. These disturbances are not better explained by intellectual disability (intellectual developmental disorder) or global developmental delay. Intellectual disability and autism spectrum disorder frequently co-occur; to make comorbid diagnoses of autism spectrum disorder and intellectual disability, social communication should be below that expected for general developmental level.**

.o the Candlewick Lake Board of Directors,

I support the family of 227 Picadilly Drive Southeast for approval of a fence on their lot for protection of their special needs children. They have our consent and we understand their need for the safety of A█████ and V█████.

**Name:**                         **Address:**

| Name: | Address: |
|---|---|
| Leslie Verhaegen | 226 Picadilly Dr Poplar Grove |
| Shenae Scott | 230 Picadilly Dr Poplar Grove |
| Ann Taylor | 279 Picadilly Dr |
| Paula Ann | 229 " |
| Kathy + Dennis Headley | 227 Picadilly Drive, Poplar Grove |
| Thacker | 231 Picadilly Dr. |
| Julie Freeman | 220 Picadilly Dr. |
| Sandy Sabo | 216 Picadilly Dr. |
| Mel 3... | 208 Picadilly Dr |
| Anita Scro | 206 Picadilly Dr SE |
| Cynthia Preuss | 217 Picadilly Dr SE |
| Constance Prust | 223 Picadilly Dr SE |
| Stephanie Guerra | 233 Picadilly Dr. SE |

Children with autism are **160 time as likely to die from drowning** as the general pediatric population. We appreciate your support in keeping our kids safe!

Children with autism are **160 time as likely to die from drowning** as the general pediatric population. We appreciate your support in keeping our kids safe!



Enchanted Garden 4x6 Cedar No Dig Fence Panel
Model Number: 850382 | Menards ® SKU: 1714050



4 x 8 Cedar French Gothic Spaced Picket
Wood Fence Panel



Yardworks Asbury 4x6 Black 3-Rail Aluminum Fence Panel
Model Number: EF200HSR-4872-MIL | Menards ® SKU: 1714620



Chain Link Fence



Idea for boundaries

*Sources*

Autism Speaks. (2013). *ASD levels of severity*. Autism Speaks.

> https://www.autismspeaks.org/levels-of-autism

CDC. (2024, May 16). *Clinical Testing and Diagnosis for Autism Spectrum Disorder*. Autism

> Spectrum Disorder (ASD). https://www.cdc.gov/autism/hcp/diagnosis/index.html

Centers for Disease Control and Prevention. (2025, April 15). *Data and Statistics on Autism*

> *Spectrum Disorder*. Autism Spectrum Disorder (ASD); CDC.

> https://www.cdc.gov/autism/data-research/index.html

*The Fair Housing Act*. (2015, August 6). Justice.gov. https://www.justice.gov/crt/fair-housing-act-1#group

*A Resource Provided by the National Autism Association*. (2011).

> http://nationalautismassociation.org/wp-content/uploads/2017/04/NAAMortalityRiskASDElopement.pdf

United Nations. (1948, December 10). *Universal Declaration of Human Rights*. United Nations.

> https://www.un.org/en/about-us/universal-declaration-of-human-rights

# Exhibit B



**CANDLEWICK LAKE ASSOCIATION**
13400 IL Route 76
Poplar Grove, IL 61065

O: 815-339-0500
F: 815-339-0501
cwl@candlewicklake.org

Nicole & Christopher Aguanno
227 Picadilly Dr SE
Poplar Grove, IL 61065

### ECC – Initial Response to Fence Request

Dear Nicole and Christopher,

Thank you for your patience as we worked with the Candlewick Lake attorney to review your request for approval of a fence.

As you are aware, Section II.C of the Amended and Restated CC&Rs prohibits fences along property lines. While fences or other enclosures might be permitted for aesthetic and/or design purposes, those are only allowed for those purposes and only under the conditions permitted by the ECC. The default position is that none are allowed on lot lines in order to keep property lines free and open to one another.

C.       Fences.  In order to preserve the natural quality and aesthetic appearance of the existing geographic areas in the Development, all property lines shall be kept free and open one to another and no fences shall be permitted on any Lot or Lot lines except where, in the opinion of the Environmental Control Committee, a fence or other enclosure, as a structure or aesthetic feature of a design concept, will contribute to and be in keeping with the character of the area.  In such cases, the Committee shall determine the size, location, height, and composition of the fence or other enclosure.

The CWL attorney has provided initial feedback regarding your fence request. While you have provided sufficient evidence regarding the children's medical diagnosis, more information/evidence is needed to justify the right to have a fence. In other words, there is a requirement of you as the requestor to provide evidence establishing a right to force the ECC/Association not to follow and enforce our legally binding CC&Rs. At this point, you have not established the right to have a fence that supersedes a long-standing rule that has been enforced for over 50 years.

Therefore, we are asking you to fine-tune your rationale to justify the need for the accommodation, establish the reasonableness of the accommodation, establish a record to show that the proposed accommodation would accomplish your proposed objectives, and provide evidence regarding how allowing a fence in this case would not be detrimental to the development as a whole. Please bring this rationale back to the ECC to have another opportunity for a face-to-face meeting. If unable to present it at a meeting in person, you are also welcome to submit this supplemental information via email or physical documents for the ECC to review at our next meeting. If the ECC agrees, in our opinion, that you have established the need for this accommodation which demonstrates a legal

right to do so, we will forward all information to the CWL attorney and ask for a full legal brief for a final stance.

We sincerely appreciate your time and understanding as we take the steps required to serve the Association in accordance with its Governing Documents.

Regards,

Environmental Control Committee
Candlewick Lake Association

# Exhibit C



**PRAIRIE STATE
LEGAL SERVICES**

October 17, 2025

**VIA EMAIL AND U.S. MAIL**

Candlewick Lake Association
13400 IL Route 76
Poplar Grove, IL 61065
cwl@candlewicklake.org

**RE:** *Reasonable Accommodation Request by Nichole Aguanno and Family, Residents of 227 Picadilly Dr SE, Poplar Grove, IL 61065*

To the Candlewick Lake Association Board –

Prairie State Legal Services, Inc. has been retained by Nichole Aguanno. If you have an attorney retained in relation to these issues, please forward this letter to him or her.

Nichole Aguanno and her family have been residents of Candlewick Lake for two years. As you know, Mrs. Aguanno submitted a reasonable accommodation request on June 30, 2025 requesting an exception to the CC&Rs to obtain the approval of the Board to construct a fence on their property. Mrs. Aguanno properly established that there is a disability related need for a fence, being that her twin sons are diagnosed with Autism Spectrum Disorder and frequently elope from the property as a result of this diagnosis. Your undated response titled "ECC – Initial Response to Fence Request" asked Mrs. Aguanno to "fine-tune" her rationale to justify the need for the accommodation, a request which is prohibited by federal law. The purpose of this letter is, therefore, to demand that you cease violating federal law and allow the Aguanno family to construct a fence on their property to ensure the safety of their children.

Under the Federal Fair Housing Act, 42 U.S.C. 3604, it is unlawful to refuse to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling. The U.S. Department of Justice and U.S. Department of Housing and Urban Development issued a joint statement titled "Reasonable Accommodations under the Fair Housing Act" (attached for ease of reference). This joint statement explains that it is unlawful to request any information in connection with a reasonable accommodation request beyond information that (1) is necessary to verify that the person meets the Act's definition of disability, (2) describes the needed accommodation, and (3) shows the relationship between the person's disability and the need for the requested accommodation. Mrs. Aguanno's June 30, 2025 request provides all pertinent information.

The Association's request for Mrs. Aguanno to "establish the reasonableness of her accommodation, establish a record to show that the proposed accommodation would accomplish

**PURSUING JUSTICE. RESTORING HOPE.**

ROCKFORD OFFICE
303 North Main St., Ste 600
Rockford, IL 61101

PHONE 815.965.2902
EMAIL info@pslegal.org
pslegal.org

Jesse Hodierne MANAGING ATTORNEY

 LSC America's Partner for Equal Justice
LEGAL SERVICES CORPORATION

 United Way
Community Partner

[the] proposed objectives, and provide evidence regarding how allowing a fence in this case would not be detrimental to the development as a whole," is unlawful.

Mrs. Aguanno has established that her twin boys meet the definition of a disability and that there is a disability related need to construct a fence on their property. Failure to approve this request will be in direct violation of federal law, and our office will have no choice but to pursue litigation, including seeking damages and injunctive relief. Please note Prairie State Legal Services, Inc. is also entitled to recover attorney's fees at the prevailing rate. Should litigation become necessary, Prairie State will pursue fees in addition to all remedies available to Mrs. Aguanno.

**Please provide approval of Mrs. Aguanno's June 30, 2025 reasonable accommodation request by October 31, 2025.** If you would like to discuss this further, please feel free to call me at 815-965-2902 or email me at tskogh@pslegal.org.

Thank you,

Tessa Skogh
Attorney at Law



**U.S. DEPARTMENT OF JUSTICE**
CIVIL RIGHTS DIVISION



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
OFFICE OF FAIR HOUSING AND EQUAL OPPORTUNITY

*Washington, D.C.*
*May 17, 2004*

**JOINT STATEMENT OF
THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
AND THE DEPARTMENT OF JUSTICE**

*REASONABLE ACCOMMODATIONS UNDER THE
FAIR HOUSING ACT*

## Introduction

The Department of Justice ("DOJ") and the Department of Housing and Urban Development ("HUD") are jointly responsible for enforcing the federal Fair Housing Act[1] (the "Act"), which prohibits discrimination in housing on the basis of race, color, religion, sex, national origin, familial status, and disability.[2] One type of disability discrimination prohibited by the Act is the refusal to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford a person with a disability the equal opportunity to use and enjoy a dwelling.[3] HUD and DOJ frequently respond to complaints alleging that housing providers have violated the Act by refusing reasonable accommodations to persons with disabilities. This Statement provides technical assistance regarding the rights and obligations of persons with disabilities and housing providers under the Act relating to

---

[1]    The Fair Housing Act is codified at 42 U.S.C. §§ 3601 - 3619.

[2]    The Act uses the term "handicap" instead of the term "disability." Both terms have the same legal meaning. *See* <u>Bragdon</u> v. <u>Abbott,</u> 524 U.S. 624, 631 (1998) (noting that definition of "disability" in the Americans with Disabilities Act is drawn almost verbatim "from the definition of 'handicap' contained in the Fair Housing Amendments Act of 1988"). This document uses the term "disability," which is more generally accepted.

[3]    42 U.S.C. § 3604(f)(3)(B).

reasonable accommodations.[4]

## Questions and Answers

**1. What types of discrimination against persons with disabilities does the Act prohibit?**

The Act prohibits housing providers from discriminating against applicants or residents because of their disability or the disability of anyone associated with them[5] and from treating persons with disabilities less favorably than others because of their disability. The Act also makes it unlawful for any person to refuse "to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford ... person(s) [with disabilities] equal opportunity to use and enjoy a dwelling."[6] The Act also prohibits housing providers from refusing residency to persons with disabilities, or placing conditions on their residency, because those persons may require reasonable accommodations. In addition, in certain circumstances, the Act requires that housing providers allow residents to

---

[4] Housing providers that receive federal financial assistance are also subject to the requirements of Section 504 of the Rehabilitation Act of 1973. 29 U.S.C. § 794. Section 504, and its implementing regulations at 24 C.F.R. Part 8, prohibit discrimination based on disability and require recipients of federal financial assistance to provide reasonable accommodations to applicants and residents with disabilities. Although Section 504 imposes greater obligations than the Fair Housing Act, (*e.g.*, providing and paying for reasonable accommodations that involve structural modifications to units or public and common areas), the principles discussed in this Statement regarding reasonable accommodation under the Fair Housing Act generally apply to requests for reasonable accommodations to rules, policies, practices, and services under Section 504. *See* U.S. Department of Housing and Urban Development, Office of Public and Indian Housing, Notice PIH 2002-01(HA) (www.hud.gov/offices/fheo/disabilities/PIH02-01.pdf) and "Section 504: Frequently Asked Questions," (www.hud.gov/offices/fheo/disabilities/sect504faq.cfm#anchor272118).

[5] The Fair Housing Act's protection against disability discrimination covers not only home seekers with disabilities but also buyers and renters without disabilities who live or are associated with individuals with disabilities 42 U.S.C. § 3604(f)(1)(B), 42 U.S.C. § 3604(f)(1)(C), 42 U.S.C. § 3604(f)(2)(B), 42 U.S.C. § (f)(2)(C). *See also* H.R. Rep. 100-711 – 24 (reprinted in 1988 U.S.C.A.N. 2173, 2184-85) ("The Committee intends these provisions to prohibit not only discrimination against the primary purchaser or named lessee, but also to prohibit denials of housing opportunities to applicants because they have children, parents, friends, spouses, roommates, patients, subtenants or other associates who have disabilities."). *Accord*: Preamble to Proposed HUD Rules Implementing the Fair Housing Act, 53 Fed. Reg. 45001 (Nov. 7, 1988) (citing House Report).

[6] 42 U.S.C. § 3604(f)(3)(B). HUD regulations pertaining to reasonable accommodations may be found at 24 C.F.R. § 100.204.

make reasonable structural modifications to units and public/common areas in a dwelling when those modifications may be necessary for a person with a disability to have full enjoyment of a dwelling.[7] With certain limited exceptions (*see* response to question 2 below), the Act applies to privately and publicly owned housing, including housing subsidized by the federal government or rented through the use of Section 8 voucher assistance.

### 2. Who must comply with the Fair Housing Act's reasonable accommodation requirements?

Any person or entity engaging in prohibited conduct – *i.e.*, refusing to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford a person with a disability an equal opportunity to use and enjoy a dwelling – may be held liable unless they fall within an exception to the Act's coverage. Courts have applied the Act to individuals, corporations, associations and others involved in the provision of housing and residential lending, including property owners, housing managers, homeowners and condominium associations, lenders, real estate agents, and brokerage services. Courts have also applied the Act to state and local governments, most often in the context of exclusionary zoning or other land-use decisions. *See e.g.*, City of Edmonds v. Oxford House, Inc., 514 U.S. 725, 729 (1995); Project Life v. Glendening, 139 F. Supp. 703, 710 (D. Md. 2001), aff'd 2002 WL 2012545 (4th Cir. 2002). Under specific exceptions to the Fair Housing Act, the reasonable accommodation requirements of the Act do not apply to a private individual owner who sells his own home so long as he (1) does not own more than three single-family homes; (2) does not use a real estate agent and does not employ any discriminatory advertising or notices; (3) has not engaged in a similar sale of a home within a 24-month period; and (4) is not in the business of selling or renting dwellings. The reasonable accommodation requirements of the Fair Housing Act also do not apply to owner-occupied buildings that have four or fewer dwelling units.

### 3. Who qualifies as a person with a disability under the Act?

The Act defines a person with a disability to include (1) individuals with a physical or mental impairment that substantially limits one or more major life activities; (2) individuals who are regarded as having such an impairment; and (3) individuals with a record of such an impairment.

The term "physical or mental impairment" includes, but is not limited to, such diseases and conditions as orthopedic, visual, speech and hearing impairments, cerebral palsy, autism, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, Human Immunodeficiency Virus infection, mental retardation, emotional illness, drug addiction (other than addiction caused by current, illegal use of a controlled substance) and alcoholism.

---

[7] This Statement does not address the principles relating to reasonable modifications. For further information see the HUD regulations at 24 C.F.R. § 100.203. This statement also does not address the additional requirements imposed on recipients of Federal financial assistance pursuant to Section 504, as explained in the Introduction.

The term "substantially limits" suggests that the limitation is "significant" or "to a large degree."

The term "major life activity" means those activities that are of central importance to daily life, such as seeing, hearing, walking, breathing, performing manual tasks, caring for one's self, learning, and speaking.[8] This list of major life activities is not exhaustive. *See e.g.*, Bragdon v. Abbott, 524 U.S. 624, 691-92 (1998)(holding that for certain individuals reproduction is a major life activity).

**4. Does the Act protect juvenile offenders, sex offenders, persons who illegally use controlled substances, and persons with disabilities who pose a significant danger to others?**

No, juvenile offenders and sex offenders, by virtue of that status, are <u>not</u> persons with disabilities protected by the Act. Similarly, while the Act does protect persons who are recovering from substance abuse, it does <u>not</u> protect persons who are currently engaging in the current illegal use of controlled substances.[9] Additionally, the Act does not protect an individual with a disability whose tenancy would constitute a "direct threat" to the health or safety of other individuals or result in substantial physical damage to the property of others unless the threat can be eliminated or significantly reduced by reasonable accommodation.

**5. How can a housing provider determine if an individual poses a direct threat?**

The Act does not allow for exclusion of individuals based upon fear, speculation, or stereotype about a particular disability or persons with disabilities in general. A determination that an individual poses a direct threat must rely on an individualized assessment that is based on reliable objective evidence (*e.g.*, current conduct, or a recent history of overt acts). The assessment must consider: (1) the nature, duration, and severity of the risk of injury; (2) the probability that injury will actually occur; and (3) whether there are any reasonable accommodations that will eliminate the direct threat. Consequently, in evaluating a recent history of overt acts, a provider must take into account whether the individual has received intervening treatment or medication that has eliminated the direct threat (*i.e.*, a significant risk of substantial harm). In such a situation, the provider may request that the individual document

---

[8] The Supreme Court has questioned but has not yet ruled on whether "working" is to be considered a major life activity. See Toyota Motor Mfg. Kentucky, Inc. v. Williams, 122 S. Ct. 681, 692, 693 (2002). If it is a major activity, the Court has noted that a claimant would be required to show an inability to work in a "broad range of jobs" rather than a specific job. *See* Sutton v. United Airlines, Inc., 527 U.S. 470, 492 (1999).

[9] *See, e.g.*, United States v. Southern Management Corp., 955 F.2d 914, 919 (4th Cir. 1992) (discussing exclusion in 42 U.S.C. § 3602(h) for "current, illegal use of or addiction to a controlled substance").

how the circumstances have changed so that he no longer poses a direct threat. A provider may also obtain satisfactory assurances that the individual will not pose a direct threat during the tenancy. The housing provider must have reliable, objective evidence that a person with a disability poses a direct threat before excluding him from housing on that basis.

**Example 1**: A housing provider requires all persons applying to rent an apartment to complete an application that includes information on the applicant's current place of residence. On her application to rent an apartment, a woman notes that she currently resides in Cambridge House. The manager of the apartment complex knows that Cambridge House is a group home for women receiving treatment for alcoholism. Based solely on that information and his personal belief that alcoholics are likely to cause disturbances and damage property, the manager rejects the applicant. The rejection is unlawful because it is based on a generalized stereotype related to a disability rather than an individualized assessment of any threat to other persons or the property of others based on reliable, objective evidence about the applicant's recent past conduct. The housing provider may not treat this applicant differently than other applicants based on his subjective perceptions of the potential problems posed by her alcoholism by requiring additional documents, imposing different lease terms, or requiring a higher security deposit. However, the manager could have checked this applicant's references to the same extent and in the same manner as he would have checked any other applicant's references. If such a reference check revealed objective evidence showing that this applicant had posed a direct threat to persons or property in the recent past and the direct threat had not been eliminated, the manager could then have rejected the applicant based on direct threat.

**Example 2**: James X, a tenant at the Shady Oaks apartment complex, is arrested for threatening his neighbor while brandishing a baseball bat. The Shady Oaks' lease agreement contains a term prohibiting tenants from threatening violence against other residents. Shady Oaks' rental manager investigates the incident and learns that James X threatened the other resident with physical violence and had to be physically restrained by other neighbors to keep him from acting on his threat. Following Shady Oaks' standard practice of strictly enforcing its "no threats" policy, the Shady Oaks rental manager issues James X a 30-day notice to quit, which is the first step in the eviction process. James X's attorney contacts Shady Oaks' rental manager and explains that James X has a psychiatric disability that causes him to be physically violent when he stops taking his prescribed medication. Suggesting that his client will not pose a direct threat to others if proper safeguards are taken, the attorney requests that the rental manager grant James X an exception to the "no threats" policy as a reasonable accommodation based on James X's disability. The Shady Oaks rental manager need only grant the reasonable accommodation if James X's attorney can provide satisfactory assurance that James X will receive appropriate counseling and

- 5 -

periodic medication monitoring so that he will no longer pose a direct threat during his tenancy. After consulting with James X, the attorney responds that James X is unwilling to receive counseling or submit to any type of periodic monitoring to ensure that he takes his prescribed medication. The rental manager may go forward with the eviction proceeding, since James X continues to pose a direct threat to the health or safety of other residents.

## 6. What is a "reasonable accommodation" for purposes of the Act?

A "reasonable accommodation" is a change, exception, or adjustment to a rule, policy, practice, or service that may be necessary for a person with a disability to have an equal opportunity to use and enjoy a dwelling, including public and common use spaces. Since rules, policies, practices, and services may have a different effect on persons with disabilities than on other persons, treating persons with disabilities exactly the same as others will sometimes deny them an equal opportunity to use and enjoy a dwelling. The Act makes it unlawful to refuse to make reasonable accommodations to rules, policies, practices, or services when such accommodations may be necessary to afford persons with disabilities an equal opportunity to use and enjoy a dwelling.

To show that a requested accommodation may be necessary, there must be an identifiable relationship, or nexus, between the requested accommodation and the individual's disability.

> **Example 1:** A housing provider has a policy of providing unassigned parking spaces to residents. A resident with a mobility impairment, who is substantially limited in her ability to walk, requests an assigned accessible parking space close to the entrance to her unit as a reasonable accommodation. There are available parking spaces near the entrance to her unit that are accessible, but those spaces are available to all residents on a first come, first served basis. The provider must make an exception to its policy of not providing assigned parking spaces to accommodate this resident.

> **Example 2:** A housing provider has a policy of requiring tenants to come to the rental office in person to pay their rent. A tenant has a mental disability that makes her afraid to leave her unit. Because of her disability, she requests that she be permitted to have a friend mail her rent payment to the rental office as a reasonable accommodation. The provider must make an exception to its payment policy to accommodate this tenant.

> **Example 3:** A housing provider has a "no pets" policy. A tenant who is deaf requests that the provider allow him to keep a dog in his unit as a reasonable accommodation. The tenant explains that the dog is an assistance animal that will alert him to several sounds, including knocks at the door, sounding of the smoke detector, the telephone ringing, and cars coming into the driveway. The housing

provider must make an exception to its "no pets" policy to accommodate this tenant.

**7. Are there any instances when a provider can deny a request for a reasonable accommodation without violating the Act?**

Yes. A housing provider can deny a request for a reasonable accommodation if the request was not made by or on behalf of a person with a disability or if there is no disability-related need for the accommodation. In addition, a request for a reasonable accommodation may be denied if providing the accommodation is not reasonable – *i.e.*, if it would impose an undue financial and administrative burden on the housing provider or it would fundamentally alter the nature of the provider's operations. The determination of undue financial and administrative burden must be made on a case-by-case basis involving various factors, such as the cost of the requested accommodation, the financial resources of the provider, the benefits that the accommodation would provide to the requester, and the availability of alternative accommodations that would effectively meet the requester's disability-related needs.

When a housing provider refuses a requested accommodation because it is not reasonable, the provider should discuss with the requester whether there is an alternative accommodation that would effectively address the requester's disability-related needs without a fundamental alteration to the provider's operations and without imposing an undue financial and administrative burden. If an alternative accommodation would effectively meet the requester's disability-related needs and is reasonable, the provider must grant it. An interactive process in which the housing provider and the requester discuss the requester's disability-related need for the requested accommodation and possible alternative accommodations is helpful to all concerned because it often results in an effective accommodation for the requester that does not pose an undue financial and administrative burden for the provider.

> **Example:** As a result of a disability, a tenant is physically unable to open the dumpster placed in the parking lot by his housing provider for trash collection. The tenant requests that the housing provider send a maintenance staff person to his apartment on a daily basis to collect his trash and take it to the dumpster. Because the housing development is a small operation with limited financial resources and the maintenance staff are on site only twice per week, it may be an undue financial and administrative burden for the housing provider to grant the requested daily trash pick-up service. Accordingly, the requested accommodation may not be reasonable. If the housing provider denies the requested accommodation as unreasonable, the housing provider should discuss with the tenant whether reasonable accommodations could be provided to meet the tenant's disability-related needs – for instance, placing an open trash collection can in a location that is readily accessible to the tenant so the tenant can dispose of his own trash and the provider's maintenance staff can then transfer the trash to the dumpster when they are on site. Such an accommodation would not involve a

fundamental alteration of the provider's operations and would involve little financial and administrative burden for the provider while accommodating the tenant's disability-related needs.

There may be instances where a provider believes that, while the accommodation requested by an individual is reasonable, there is an alternative accommodation that would be equally effective in meeting the individual's disability-related needs. In such a circumstance, the provider should discuss with the individual if she is willing to accept the alternative accommodation. However, providers should be aware that persons with disabilities typically have the most accurate knowledge about the functional limitations posed by their disability, and an individual is not obligated to accept an alternative accommodation suggested by the provider if she believes it will not meet her needs and her preferred accommodation is reasonable.

**8. What is a "fundamental alteration"?**

A "fundamental alteration" is a modification that alters the essential nature of a provider's operations.

> **Example:** A tenant has a severe mobility impairment that substantially limits his ability to walk. He asks his housing provider to transport him to the grocery store and assist him with his grocery shopping as a reasonable accommodation to his disability. The provider does not provide any transportation or shopping services for its tenants, so granting this request would require a fundamental alteration in the nature of the provider's operations. The request can be denied, but the provider should discuss with the requester whether there is any alternative accommodation that would effectively meet the requester's disability-related needs without fundamentally altering the nature of its operations, such as reducing the tenant's need to walk long distances by altering its parking policy to allow a volunteer from a local community service organization to park her car close to the tenant's unit so she can transport the tenant to the grocery store and assist him with his shopping.

**9. What happens if providing a requested accommodation involves some costs on the part of the housing provider?**

Courts have ruled that the Act may require a housing provider to grant a reasonable accommodation that involves costs, so long as the reasonable accommodation does not pose an undue financial and administrative burden and the requested accommodation does not constitute a fundamental alteration of the provider's operations. The financial resources of the provider, the cost of the reasonable accommodation, the benefits to the requester of the requested accommodation, and the availability of other, less expensive alternative accommodations that would effectively meet the applicant or resident's disability-related needs must be considered in determining whether a requested accommodation poses an undue financial and administrative

- 8 -

burden.

**10.  What happens if no agreement can be reached through the interactive process?**

A failure to reach an agreement on an accommodation request is in effect a decision by the provider not to grant the requested accommodation.  If the individual who was denied an accommodation files a Fair Housing Act complaint to challenge that decision, then the agency or court receiving the complaint will review the evidence in light of applicable law- and decide if the housing provider violated that law.  For more information about the complaint process, see question 19 below.

**11.  May a housing provider charge an extra fee or require an additional deposit from applicants or residents with disabilities as a condition of granting a reasonable accommodation?**

No.  Housing providers may not require persons with disabilities to pay extra fees or deposits as a condition of receiving a reasonable accommodation.

> **Example 1**:  A man who is substantially limited in his ability to walk uses a motorized scooter for mobility purposes.  He applies to live in an assisted living facility that has a policy prohibiting the use of motorized vehicles in buildings and elsewhere on the premises.  It would be a reasonable accommodation for the facility to make an exception to this policy to permit the man to use his motorized scooter on the premises for mobility purposes.  Since allowing the man to use his scooter in the buildings and elsewhere on the premises is a reasonable accommodation, the facility may not condition his use of the scooter on payment of a fee or deposit or on a requirement that he obtain liability insurance relating to the use of the scooter.  However, since the Fair Housing Act does not protect any person with a disability who poses a direct threat to the person or property of others, the man must operate his motorized scooter in a responsible manner that does not pose a significant risk to the safety of other persons and does not cause damage to other persons' property.  If the individual's use of the scooter causes damage to his unit or the common areas, the housing provider may charge him for the cost of repairing the damage (or deduct it from the standard security deposit imposed on all tenants), if it is the provider's practice to assess tenants for any damage they cause to the premises.

> **Example 2:**  Because of his disability, an applicant with a hearing impairment needs to keep an assistance animal in his unit as a reasonable accommodation. The housing provider may not require the applicant to pay a fee or a security deposit as a condition of allowing the applicant to keep the assistance animal. However, if a tenant's assistance animal causes damage to the applicant's unit or the common areas of the dwelling, the housing provider may charge the tenant for

the cost of repairing the damage (or deduct it from the standard security deposit imposed on all tenants), if it is the provider's practice to assess tenants for any damage they cause to the premises.

### 12. When and how should an individual request an accommodation?

Under the Act, a resident or an applicant for housing makes a reasonable accommodation request whenever she makes clear to the housing provider that she is requesting an exception, change, or adjustment to a rule, policy, practice, or service because of her disability. She should explain what type of accommodation she is requesting and, if the need for the accommodation is not readily apparent or not known to the provider, explain the relationship between the requested accommodation and her disability.

An applicant or resident is not entitled to receive a reasonable accommodation unless she requests one. However, the Fair Housing Act does not require that a request be made in a particular manner or at a particular time. A person with a disability need not personally make the reasonable accommodation request; the request can be made by a family member or someone else who is acting on her behalf. An individual making a reasonable accommodation request does not need to mention the Act or use the words "reasonable accommodation." However, the requester must make the request in a manner that a reasonable person would understand to be a request for an exception, change, or adjustment to a rule, policy, practice, or service because of a disability.

Although a reasonable accommodation request can be made orally or in writing, it is usually helpful for both the resident and the housing provider if the request is made in writing. This will help prevent misunderstandings regarding what is being requested, or whether the request was made. To facilitate the processing and consideration of the request, residents or prospective residents may wish to check with a housing provider in advance to determine if the provider has a preference regarding the manner in which the request is made. However, housing providers must give appropriate consideration to reasonable accommodation requests even if the requester makes the request orally or does not use the provider's preferred forms or procedures for making such requests.

> **Example:** A tenant in a large apartment building makes an oral request that she be assigned a mailbox in a location that she can easily access because of a physical disability that limits her ability to reach and bend. The provider would prefer that the tenant make the accommodation request on a pre-printed form, but the tenant fails to complete the form. The provider must consider the reasonable accommodation request even though the tenant would not use the provider's designated form.

### 13. Must a housing provider adopt formal procedures for processing requests for a reasonable accommodation?

No.  The Act does not require that a housing provider adopt any formal procedures for reasonable accommodation requests.  However, having formal procedures may aid individuals with disabilities in making requests for reasonable accommodations and may aid housing providers in assessing those requests so that there are no misunderstandings as to the nature of the request, and, in the event of later disputes, provide records to show that the requests received proper consideration.

A provider may not refuse a request, however, because the individual making the request did not follow any formal procedures that the provider has adopted.  If a provider adopts formal procedures for processing reasonable accommodation requests, the provider should ensure that the procedures, including any forms used, do not seek information that is not necessary to evaluate if a reasonable accommodation may be needed to afford a person with a disability equal opportunity to use and enjoy a dwelling.  See Questions 16 - 18, which discuss the disability-related information that a provider may and may not request for the purposes of evaluating a reasonable accommodation request.

### 14.  Is a housing provider obligated to provide a reasonable accommodation to a resident or applicant if an accommodation has not been requested?

No.  A housing provider is only obligated to provide a reasonable accommodation to a resident or applicant if a request for the accommodation has been made.  A provider has notice that a reasonable accommodation request has been made if a person, her family member, or someone acting on her behalf requests a change, exception, or adjustment to a rule, policy, practice, or service because of a disability, even if the words "reasonable accommodation" are not used as part of the request.

### 15.  What if a housing provider fails to act promptly on a reasonable accommodation request?

A provider has an obligation to provide prompt responses to reasonable accommodation requests.  An undue delay in responding to a reasonable accommodation request may be deemed to be a failure to provide a reasonable accommodation.

### 16.  What inquiries, if any, may a housing provider make of current or potential residents regarding the existence of a disability when they have not asked for an accommodation?

Under the Fair Housing Act, it is usually unlawful for a housing provider to (1) ask if an applicant for a dwelling has a disability or if a person intending to reside in a dwelling or anyone associated with an applicant or resident has a disability, or (2) ask about the nature or severity of such persons' disabilities.  Housing providers may, however, make the following inquiries, provided these inquiries are made of all applicants, including those with and without disabilities:

- An inquiry into an applicant's ability to meet the requirements of tenancy;

- An inquiry to determine if an applicant is a current illegal abuser or addict of a controlled substance;

- An inquiry to determine if an applicant qualifies for a dwelling legally available only to persons with a disability or to persons with a particular type of disability; and

- An inquiry to determine if an applicant qualifies for housing that is legally available on a priority basis to persons with disabilities or to persons with a particular disability.

**Example 1:** A housing provider offers accessible units to persons with disabilities needing the features of these units on a priority basis. The provider may ask applicants if they have a disability and if, in light of their disability, they will benefit from the features of the units. However, the provider may not ask applicants if they have other types of physical or mental impairments. If the applicant's disability and the need for the accessible features are not readily apparent, the provider may request reliable information/documentation of the disability-related need for an accessible unit.

**Example 2:** A housing provider operates housing that is legally limited to persons with chronic mental illness. The provider may ask applicants for information needed to determine if they have a mental disability that would qualify them for the housing. However, in this circumstance, the provider may not ask applicants if they have other types of physical or mental impairments. If it is not readily apparent that an applicant has a chronic mental disability, the provider may request reliable information/documentation of the mental disability needed to qualify for the housing.

In some instances, a provider may also request certain information about an applicant's or a resident's disability if the applicant or resident requests a reasonable accommodation. See Questions 17 and 18 below.

**17. What kinds of information, if any, may a housing provider request from a person with an obvious or known disability who is requesting a reasonable accommodation?**

A provider is entitled to obtain information that is necessary to evaluate if a requested reasonable accommodation may be necessary because of a disability. If a person's disability is obvious, or otherwise known to the provider, and if the need for the requested accommodation is also readily apparent or known, then the provider may not request any additional information

about the requester's disability or the disability-related need for the accommodation.

If the requester's disability is known or readily apparent to the provider, but the need for the accommodation is not readily apparent or known, the provider may request only information that is necessary to evaluate the disability-related need for the accommodation.

> **Example 1:** An applicant with an obvious mobility impairment who regularly uses a walker to move around asks her housing provider to assign her a parking space near the entrance to the building instead of a space located in another part of the parking lot. Since the physical disability (*i.e.*, difficulty walking) and the disability-related need for the requested accommodation are both readily apparent, the provider may not require the applicant to provide any additional information about her disability or the need for the requested accommodation.

> **Example 2:** A rental applicant who uses a wheelchair advises a housing provider that he wishes to keep an assistance dog in his unit even though the provider has a "no pets" policy. The applicant's disability is readily apparent but the need for an assistance animal is not obvious to the provider. The housing provider may ask the applicant to provide information about the disability-related need for the dog.

> **Example 3:** An applicant with an obvious vision impairment requests that the leasing agent provide assistance to her in filling out the rental application form as a reasonable accommodation because of her disability. The housing provider may not require the applicant to document the existence of her vision impairment.

**18. If a disability is not obvious, what kinds of information may a housing provider request from the person with a disability in support of a requested accommodation?**

A housing provider may not ordinarily inquire as to the nature and severity of an individual's disability (*see* Answer 16, above). However, in response to a request for a reasonable accommodation, a housing provider may request reliable disability-related information that (1) is necessary to verify that the person meets the Act's definition of disability (*i.e.*, has a physical or mental impairment that substantially limits one or more major life activities), (2) describes the needed accommodation, and (3) shows the relationship between the person's disability and the need for the requested accommodation. Depending on the individual's circumstances, information verifying that the person meets the Act's definition of disability can usually be provided by the individual himself or herself (*e.g.*, proof that an individual under 65 years of age receives Supplemental Security Income or Social Security Disability Insurance benefits[10] or a credible statement by the individual). A doctor or other

---

[10] Persons who meet the definition of disability for purposes of receiving Supplemental Security Income ("SSI") or Social Security Disability Insurance ("SSDI") benefits in most cases meet the definition of disability under the Fair Housing Act, although the converse may not be true. *See e.g.*, <u>Cleveland</u> v. <u>Policy Management Systems Corp.</u>, 526 U.S. 795, 797 (1999)

medical professional, a peer support group, a non-medical service agency, or a reliable third party who is in a position to know about the individual's disability may also provide verification of a disability. In most cases, an individual's medical records or detailed information about the nature of a person's disability is not necessary for this inquiry.

Once a housing provider has established that a person meets the Act's definition of disability, the provider's request for documentation should seek only the information that is necessary to evaluate if the reasonable accommodation is needed because of a disability. Such information must be kept confidential and must not be shared with other persons unless they need the information to make or assess a decision to grant or deny a reasonable accommodation request or unless disclosure is required by law (*e.g.*, a court-issued subpoena requiring disclosure).

**19. If a person believes she has been unlawfully denied a reasonable accommodation, what should that person do if she wishes to challenge that denial under the Act?**

When a person with a disability believes that she has been subjected to a discriminatory housing practice, including a provider's wrongful denial of a request for reasonable accommodation, she may file a complaint with HUD within one year after the alleged denial or may file a lawsuit in federal district court within two years of the alleged denial. If a complaint is filed with HUD, HUD will investigate the complaint at no cost to the person with a disability.

There are several ways that a person may file a complaint with HUD:

- By placing a toll-free call to 1-800-669-9777 or TTY 1-800-927-9275;

- By completing the "on-line" complaint form available on the HUD internet site: http://www.hud.gov; or

- By mailing a completed complaint form or letter to:

    Office of Fair Housing and Equal Opportunity
    Department of Housing & Urban Development
    451 Seventh Street, S.W., Room 5204
    Washington, DC 20410-2000

---

(noting that SSDI provides benefits to a person with a disability so severe that she is unable to do her previous work and cannot engage in any other kind of substantial gainful work whereas a person pursuing an action for disability discrimination under the Americans with Disabilities Act may state a claim that "with a reasonable accommodation" she could perform the essential functions of the job).

Upon request, HUD will provide printed materials in alternate formats (large print, audio tapes, or Braille) and provide complainants with assistance in reading and completing forms.

The Civil Rights Division of the Justice Department brings lawsuits in federal courts across the country to end discriminatory practices and to seek monetary and other relief for individuals whose rights under the Fair Housing Act have been violated. The Civil Rights Division initiates lawsuits when it has reason to believe that a person or entity is involved in a "pattern or practice" of discrimination or when there has been a denial of rights to a group of persons that raises an issue of general public importance. The Division also participates as *amicus curiae* in federal court cases that raise important legal questions involving the application and/or interpretation of the Act. To alert the Justice Department to matters involving a pattern or practice of discrimination, matters involving the denial of rights to groups of persons, or lawsuits raising issues that may be appropriate for *amicus* participation, contact:

> U.S. Department of Justice
> Civil Rights Division
> Housing and Civil Enforcement Section – G St.
> 950 Pennsylvania Avenue, N.W.
> Washington, DC 20530

For more information on the types of housing discrimination cases handled by the Civil Rights Division, please refer to the Housing and Civil Enforcement Section's website at http://www.usdoj.gov/crt/housing/hcehome.html.

A HUD or Department of Justice decision not to proceed with a Fair Housing Act matter does not foreclose private plaintiffs from pursuing a private lawsuit. However, litigation can be an expensive, time-consuming, and uncertain process for all parties. HUD and the Department of Justice encourage parties to Fair Housing Act disputes to explore all reasonable alternatives to litigation, including alternative dispute resolution procedures, such as mediation. HUD attempts to conciliate all Fair Housing Act complaints. In addition, it is the Department of Justice's policy to offer prospective defendants the opportunity to engage in pre-suit settlement negotiations, except in the most unusual circumstances.

# Exhibit D



Main Office: 630-668-8500
Fax: 630-668-9218
spointner@rathjelaw.com

November 19, 2025

***Via Electronic Mail*** *tskogh@pslegal.org*
Tessa Skogh, Esq.
Prairie State Legal Services
303 North Main Street, Ste. 600
Rockford, IL 61101

Re: Aguanno Reasonable Accommodation Request
227 Piccadilly Drive SE, Poplar Grove, IL
Your October 17, 2025 letter

Dear Tessa:

As you know from our email exchange, I represent the Candlewick Lake Association. I am in receipt of your October 17, 2025 letter, and have reviewed he same with my client. The purpose of this letter is to formally respond to your letter in general, and to explain our reasoning for the actions we have taken thus far. Rest assured that regardless of the substance of this letter, our mindset is first and foremost to follow the law and stick to a reasonable and rational process to ensure that we arrive at the right legal decision. In doing so, we are trying to offer your client ample opportunity to supplement her application so as to make her best case as to why she believes she is entitled to construct a fence on her property in Candlewick Lake.

## I. **Background Facts**

As a threshold matter, it is important to establish a baseline set of facts and review how we arrived at the point in time when you drafted your October 17, 2025 letter:

- On July 1, 2025, the Aguanno family requested permission to construct a fence around their back yard, citing authority under the "United States Department of Justice Fair Housing Act", and "The Universal Declaration of Human Rights Article 13, Section 1 (United Nations, 1948).

- The reasoning offered was that locks on the doors of their home are insufficient to keep their children inside the house, and thus a (presumably more secure?) fence around the backyard was needed. Let me repeat: the argument is that a fence around the backyard is needed because locks on the inside of the home are not keeping the children in the home.

- Candlewick Lake has more than 1800 homes, and in the development, fences are prohibited by the Declaration when they are along property lines. Fences not along property lines could be requested and granted permission by the ECC to be constructed, but only for aesthetic and/or design purposes, and the ECC is

300 EAST ROOSEVELT ROAD, SUITE 220 ■ WHEATON, ILLINOIS 60187

Tessa Skogh, Esq.
November 19, 2025
Page 2

empowered to condition approval to ensure any fences are not in conflict with the intent of the Declaration upon which all property owners agreed would control development in Candlewick Lake. The Declaration provides: "In order to preserve the natural quality and aesthetic appearance of the existing geographic areas in the Development, all property lines shall be kept free and open to one another and no fences shall be permitted on any Lot or Lot lines except where, in the opinion of the ECC, a fence or other enclosure, as a structure or aesthetic feature of a design concept, will contribute to and be in keeping with the character of the area."

- In other words, no fences on lot lines will be allowed, and interior fences are only allowed in limited circumstances. This appears to be consistent with Ms. Aguanno's understanding, for in her July 1, 2025 letter to the Association making the fence request, she wrote: "We know this is a big ask considering Candlewick[s] by-laws, rules and traditions…"

- In the application, your client did not tender a survey, formal plans, or any measurements to establish exactly what she was proposing. Rather, your client submitted only this aerial to show her "idea for boundaries", which I am copying here along with a snippet of the County GIS map of her lot in the middle, and her lot along with the home to the southwest on the right.




Idea for boundaries





- As you can see, the "idea for boundaries" would result in a direct violation of the intent of the Declaration to keep boundary lines open.

## II.    Analysis

The application raises a number of key questions that have not yet been answered. Where exactly on the lot will it be constructed? How high will it be? Of what materials will it be constructed? What will be the design of the fence? What conditions are being suggested by the applicant, such as a restrictive covenant against the property requiring the fence to be removed

Tessa Skogh, Esq.
November 19, 2025
Page 3

when the connection between the disability and the presence of a fence no longer exists? What other issues may become apparent if the ECC is given plans, renderings, or mockups of what the fence will look like to neighboring properties? Given all these questions, it is clear the applicant has thus far presented insufficient evidence to the ECC to establish *a right* to a reasonable accommodation for a fence under the circumstances.

However, instead of denying the application for failure to offer a sufficient foundation of evidence to establish a right to this requested accommodation, the Association decided to proceed to request "information that is necessary to evaluate if a requested reasonable accommodation may be necessary" (to quote FAQ #17 from the 2004 DOJ directive which you acknowledge applies to this application). Specifically, the ECC invited your client to provide more information and even explained why the Association was seeking more information. Rather than receiving more documentation and information, we received your letter that suggested that asking for more information to establish a right to the requested accommodation was somehow "unlawful" and was a violation of federal law.

As has already been established, the DOJ not only expressly acknowledges we are entitled to seek additional information regarding the specific accommodation your client is requesting, but more importantly information connecting the disability to the requested accommodation. Kindly confirm we are in agreement that asking for more information on these two points is not a violation of federal law. If you believe it is (as you frankly state in your letter), please provide the legal basis for your position so that I can evaluate any proffered authority for your conclusion. If, on the other hand, you agree we were entitled to request additional information on these two points, we can then proceed to the next issue.

While we will not tell you or your client what to do, please note that if you file suit against the Association based on the record before us (as you state you will do in no uncertain terms), please understand that in addition to the basic questions noted above, some of the additional questions that we believe are unanswered on the record upon which you would be litigating include but are not limited to:

1. Is the proposed fence an exterior fence, or an interior one that does not block sight lines of neighboring properties?
2. Is there evidence that would suggest that deviating from the terms and conditions of the Declaration and the 50-year history of Candlewick Lake having no fences would not fundamentally alter the nature of Candlewick's development, or otherwise be contrary to the interest, welfare, or rights of all or part of the other Owners?
3. To what extent is it relevant that fences in Candlewick Lake are not somewhat rare but essentially are non-existent with a 50-year history?
4. To what degree is it relevant that the applicant cannot point to a single other application whereby the Association granted a fence request like this?

If your client chooses to not supplement the application in any way, and you wish to pursue litigation based on this record, please let me know.

Tessa Skogh, Esq.
November 19, 2025
Page 4

Before I close, there are two of points in your letter that are worthy of comment. First, as previously noted, you allege it was illegal for us to request any additional information to "fine-tune" the request. I respectfully refer your attention to the DOJ directive that states "An interactive process in which the housing provider and the requester discuss he requested disability-related need for the requested accommodation and possible alternative accommodations is helpful to all concerned because it often results in an effective accommodation for the requester that does not pose an undue financial and administrative burden for the provider." If you believe our proposed offering to allow your client to supplement the record is unlawful despite this DOJ language, kindly let me know.

Second, your client's case appears to hinge I part upon her claims that a fence accommodation is necessary because they have "taken every precaution within our control to ensure [the safety of the children] including installing hard to open door locks and door alarms, extra gates up between our kids and our front door, and motion detection cameras." The argument goes that the applicant has done "everything possible to ensure our hose is as safe as possible so [the boys] don't slip out during our crazy family chaos, or during the night." Therefore, it appears, the applicant is suggesting that while interior locks, door alarms, gates, and motion detection cameras fail to keep the boys safe inside, an outside fence is the only reasonable accommodation that will be the game-changer for the family. Your client might want to consider offering additional information and documentation to firm up the connection on the record between the disability on the one hand, and the need for a fence to address what is the problem on the other.

## III.    Closing Comments

Tessa, we are not looking for a fight. Rather, we are trying to follow a logical and methodological process to ensure that we have given your client ample opportunity to establish a record upon which the Association can fully evaluate the request. We hope that you and your client will receive the olive branch the Association has extended, and work with us through this process in a cooperative fashion. Once we have either received all of your client's documentation and information, the Association will deliberate and make a decision. Naturally, the import of this letter is that the application has not yet been granted or denied. If you conclude, as you appear to suggest in your October 17th letter that the Association's failure to grant the request based on the record before the Association, we certainly cannot stop you from filing suit. However, we submit that it may be wise for your client to consider working with the ECC to develop a better record.

Thank you for your attention to this matter. Please do not hesitate to contact me should you have any questions or comments with regard to the above.

Very truly yours,

*Scott E. Pointner, Esq.*

Scott E. Pointner, Esq.

cc: Heidi Sroga, General Manager

# Exhibit E



**PRAIRIE STATE
LEGAL SERVICES**

December 1, 2025

**VIA EMAIL**

Candlewick Lake Association
13400 IL Route 76
Poplar Grove, IL 61065
cwl@candlewicklake.org

**RE:** *Reasonable Accommodation Request by Nichole Aguanno and Family, Residents of 227 Picadilly Dr SE, Poplar Grove, IL 61065*

Dear Scott,

I received your letter dated November 19, 2025. From that letter, it appears there is a misunderstanding regarding my clients' reasonable accommodation request to build a fence. The purpose of this letter, therefore, is to provide additional clarification.

In your letter, you asserted that a fence is requested because the door locks are not keeping the children in the home. Your framing of the request was incorrect. As stated in my clients' letter dated June 30, 2025, and reiterated in my subsequent letter dated October 17, 2025, the reasonable accommodation request was made because the Aguannos are unable to use and enjoy their backyard for outdoor play as a family. The facts about the locks were included to demonstrate the severity of the boys' disability, including that they frequently engage in eloping behaviors. To specifically quote the Aguannos' June 2025 letter, "… redirecting [the boys] to safety is how we spend 90% of our family time outside. This has significantly impacted our quality of family life and we are desperately seeking to improve this." Thus, a fence is necessary to keep the boys safely in their backyard during outdoor play.

While we are acutely aware that fences along property lines are prohibited by the Declaration, the Declaration itself is not grounds for denying a reasonable accommodation. The intended purpose of a reasonable accommodation is to provide an *exception* to the existing rules and policies so that people with disabilities experience the same opportunities to use and enjoy their property as individuals without disabilities. Although the Aguannos are entitled to a fence on their property line, that is not even what they are requesting. Rather, the Aguannos are requesting to install a fence around a reasonable amount of space within their backyard to allow adequate space for their children to safely run and play. The "idea for boundaries" submitted with my client's June 2025 letter was a simple proposal. The Aguannos are, and always have been, willing to work with the Association to create a plan for a fence that meets their needs while also allowing reasonable input from the Association regarding location and design.

PURSUING JUSTICE. RESTORING HOPE.

ROCKFORD OFFICE
303 North Main St., Ste 600
Rockford, IL 61101

PHONE 815.965.2902
EMAIL info@pslegal.org
pslegal.org

Jesse Hodierne MANAGING ATTORNEY





However, your letter continues to request information that is not pertinent to processing the Aguannos' reasonable accommodation request. You correctly cite that the DOJ directive states that the Association may request "information that is necessary to evaluate if a requested reasonable accommodation may be necessary," but the Aguannos have already provided ample information. Moreover, your interpretation of the word "necessary" is overly broad and beyond what the DOJ states. The DOJ's directive does not authorize the Association to run the gamut of demands and questions that the family must answer in order to someday convince the Association that a reasonable accommodation is necessary. Rather, FAQ #17 explains that the Association "may request" additional information about the disability or disability-related need for an accommodation if the disability or the disability-related need are not obvious, readily apparent, or otherwise known. The DOJ clarifies this in FAQ #6, stating that the necessity of a reasonable accommodation simply requires "an identifiable relationship, or nexus, between the requested accommodation and the individual's disability."

Again, the Aguannos have already supplied the Association with sufficient documentation to establish both a disability and a disability-related need for the accommodation. The Aguannos' initial letter and my subsequent letter both establish a nexus between the requested accommodation and the boys' disability. The Association's undated response to the Aguannos' initial letter acknowledges that they were provided with "sufficient evidence regarding the children's medical diagnosis." Thus, there is no dispute that the children have established disabilities. Still, the Aguannos have gone above and beyond what is required of a reasonable accommodation request by providing information regarding autism and eloping behaviors. The presence of a disability and a nexus between that disability and the requested accommodation of permission to construct a fence is sufficient to establish a right to a reasonable accommodation. Your continued requests for additional information exceed what is necessary to process and grant this request.

The Aguannos retained counsel to assist them in responding to the Association's response to their initial request. The evidence provided in that initial request and at the ECC meeting is sufficient to establish a right to a reasonable accommodation. To be clear, the Aguannos understand the value of a meaningful interactive process. The Aguannos are not opposed to engaging in the interactive process; rather, the Association is requesting information that is outside the scope of what is needed to process this request. The specifics of the type, height, and location of the fence, though options were offered in the initial request, are not necessary to process this request. Those details can be addressed once the request itself has been granted. The Association's continued refusal to process this request without this information under the guise of engaging in the interactive process is causing undue delay in granting a reasonable accommodation. It is well established in caselaw that continuing to delay for months and asking for even more information amounts to a constructive denial. It has now been five months since the Aguannos' initial request. We have likely reached a point in the year where constructing a fence will not be feasible until spring, meaning the Aguannos will have to spend the winter either fearing for their children's safety when they attempt to play outside, or keeping them inside. Both of these options will cause the family additional emotional distress and both constitute a denial of the ability to equally use and enjoy their property.

In an effort to avoid litigation, I will answer your questions in hopes that the Association will use this information (though not required) to approve this request:

1. It is unclear what you mean by exterior versus interior fence. The fence would not be on the property line. It would be within the bounds of the Aguannos' property, and large enough to provide adequate space for the children to play. The building materials would be appropriate for outdoor use, and any "finished" side of the fence would likely face outward, which is customary.

2. Courts have held that construction of a fence despite a development's terms and conditions that prohibit fences is not considered a "fundamental alteration." Arguments that fences serve as a fundamental alteration to the aesthetic character of a neighborhood – which is what you state the Declaration serves to protect – have been rejected. "Concerns for aesthetics and property values" are not valid reasons for denying a reasonable accommodation in violation of the Fair Housing Act. *See Howard v. City of Beavercreek,* 108 F.Supp.2d 866 (S.D. Ohio 2000). This is especially true as several properties in the Association have existing fences and the Association allows fences for aesthetic purposes. Furthermore, the Aguannos provided signatures from their surrounding neighbors in their initial request that showed support for the construction of a fence.

3. It is not relevant.

4. It is not relevant.

**To reiterate, the Aguannos are requesting an exception to the Declaration's prohibition against fences so that they may use and enjoy their property while outside playing with their disabled children. This request is not related to any alleged insufficiency in their ability to keep their children safely inside of their home.** The presence of a disability and need for a fence has been properly and adequately established, and the requested accommodation is reasonable under the requirements of the Fair Housing Act. We are not refusing to engage in the interactive process, but rather your additional requests exceed what is necessary to process this request. The Aguannos are willing to tender a survey and provide formal plans for a fence (including materials, height, design, etc.) **once their reasonable accommodation request to construct a fence has been approved.**

The Association has been presented with more than enough information to process this request. **Please provide an approval to this request by December 10, 2025,** or we will consider the request denied and file a complaint for damages, injunctive relief, and all other remedies available to us under the law.

Thank you,

Tessa Skogh
Attorney at Law

# Exhibit F



Main Office: 630-668-8500
Fax: 630-668-9218
spointner@rathjelaw.com

December 22, 2025

***Via Electronic Mail*** *tskogh@pslegal.org*
Tessa Skogh, Esq.
Prairie State Legal Services
303 North Main Street, Ste. 600
Rockford, IL 61101

    Re:    Aguanno Reasonable Accommodation Request
          227 Piccadilly Drive SE, Poplar Grove, IL
          Your October 17, 2025 letter

Dear Tessa:

I am in receipt of your December 1, 2025 letter. The purpose of this correspondence is to first outline our understanding of your position so that you can confirm we have all of the documents and understand your position, and second to outline our proposed course of dealing going forward.

<u>Our Understanding of Your Position</u>

1. Based on what your clients said orally, my client was under the impression the request was due to the inability of your clients to keep the kids inside the house. You state that is not the case in your letter. Please note your clients stated in writing in their application "…we have taken every precaution within our control to ensure their safety including installing hard to open door locks and door alarms, extra gates up between our kids and our front door, and motion detection camera. We are doing everything possible to ensure our house is as safe as possible so A███ and V███ don't slip out during our crazy family chaos."
    a. Given your letter, we will assume the issue about door locks is not a basis for the request, and instead it is due to the boys having improved behavior due to their being outside.
    b. Moreover, the Association accepts your client's statements and the evidence they provided that the basis for the request to construct a fence is reasonably related to the stated disability.
2. While we disagree with your premise that the Association is prohibited from denying a fence around the permiter, we are pleased to see that our clients are not requesting a permiter fence.
3. With regard to details, we are pleased to see that you and your clients appear to be acknowledging that the fence request thus far presented lacks the level of detail that is required in order for the Association to give a "yes" to the request to construct a fence. We arrive at this conclusion based on your statement that your clients are "willing to

Tessa Skogh, Esq.
December 22, 2025
Page 2

work with the Association to create a plan for a fence that meets their needs while also allowing reasonable input from the Association regarding location and design."

4. With regard to the details necessary to approve a fence request, you suggest "the Aguannos have already provided ample information." If that is correct, kindly refer us to the documents and testimony that answer the following questions:

   a. Exactly where on the property (i.e. number of feet away from the dwelling, number of feet from the property lines) the new fence will be constructed). The "idea for boundaries" photo in the application is inadequate for the Association to conclude a nexus between the requested accommodation and the reason for the request;

   b. The exact height of the proposed fence (three of the four styles in the application appear to be 4 feet tall but the third is indeterminate as to the height);

   c. The materials from which the fence will be constructed;

   d. The color of the fence;

   e. Whether the fence can be seen through like a chain link fence, or

   f. The contractor or agent constructing the fence; and

   g. Any other information your clients need to submit to the County in order to secure the fence permit.

5. To the extent you or your clients have concluded the Association has denied the application, that is simply not the case, for that has not occurred. Rather, we are simply asking for the level of detail that is reasonably required by the Association to process the application. If this matter ended up in litigation and a court were asked to force the Association to approve the fence request, I would ask the court where exactly on the property is the fence to be constructed, and how high will it be (among other questions), and the court would not be able to answer that given the information currently before us. Again, we are not trying to be difficult, but we are cognizant of the fact that approving a fence request with the record before us would set a precedent that would be harmful for the Association given the details that are still missing. In your letter, you state that specifics like the type, height, and location of the fence are "not necessary to process this request." Kindly share your basis for that statement. Are you suggesting that a perimeter fence around the entire property that is eight feet high must be permitted? The granting of your request based on the current record would not prohibit that for those details have not been committed to by your client.

6. With regard to the issue of interior versus exterior in describing the fence, the difference between a fence on the property line and a fence off the property line is a significant issue at Candlewick Lake. We are not being unreasonable in asking for your client to identify exactly where the fence will be located.

7. It is interesting you cite the District Court case for *Howard v. City of Beavercreek* case from 2000 given that Mr. Howard lost his subsequent appeal up to the Sixth Circuit 2002. Moreover, the District Court concluded aesthetics are not proper considerations based on the Michigan District Court case *Larkin v. State of Mich.*, 883 F.Supp. 172 (1994) which addressed not aesthetics but property values. In our case, it is not an insignificant point that there have been at most three instances in Candlewick Lake where fences were permitted (if you give a liberal interpretation of the definition of a "fence"), and all other 1900 or so properties have no fences.

Tessa Skogh, Esq.
December 22, 2025
Page 3

To the extent your clients are willing to tender a survey and formal plans for a fence, including the materials, height, design, etc., but only after their accommodation request has been approved, I note in your letter you acknowledge the DOJ directive states that the Association may request "information that is necessary to evaluate if a requested reasonable accommodation may be necessary". If the request is for a fence around the entire permitter and is six feet high, the Association's decision may be different than if the requested fence is a subset of the backyard, can be seen through, and is not any higher than is reasonably necessary. We are again not trying to be difficult, but the lack of detail coupled with the demand to approve a fence without this detail is not consistent with the reasonableness built into the law. It should not be difficult for your clients to provide this information given that we have already informed your clients that the Association is not challenging the basis for the accommodation, just the nexus between the fence request and the established basis for it.

One final detail is worthy of discussion. In my November 19th letter I inquired as to the conditions upon which your clients would be willing to be required to remove the fence if and when they are no longer living there, and/or the disability has been removed. You did not provide any response to that question. Naturally, your client's requesting the right to construct a fence without the obligation to have it removed after they move or the disability is no longer present makes a difference in you establishing a right to construct the fence due to a nexus between the basis for the request and the request itself. Kindly include that level of detail. If you and your clients would prefer, please consider something like the attached covenant that one of my partners prepared for another one of our clients.

Thank you for your attention to this matter. Please do not hesitate to contact me should you have any questions or comments with regard to the above. I look forward to hearing from you.

Very truly yours,

*Scott E. Pointner, Esq.*

Scott E. Pointner, Esq.

cc: Heidi Sroga, General Manager

encl: Memorandum of Fence Agreement, DuPage County Recording R2021-007748

KATHLEEN V. CARRIER, RECORDER
DUPAGE COUNTY ILLINOIS
01/15/2021 08:40 AM
RHSP

DOCUMENT # R2021-007748

This instrument prepared by:
J. Arrigo
Rathje Woodward LLC
300 East Roosevelt Rd.
Wheaton, IL 60187

## MEMORANDUM OF FENCE AGREEMENT

This Memorandum of Agreement (the "Memorandum") is executed this 11th day of January, 2021 by the Lakewood Improvement Association, an Illinois not-for-profit corporation and Illinois common interest community association, acting by and through its duly-elected board of directors ("Lakewood") pursuant to and in keeping with the terms and provisions of a written agreement between Lakewood and Julie and Kevin Foster (the "Fosters") executed by the Fosters on or about July 20, 2020, a copy of which is attached hereto as Exhibit "A" (the "Fence Agreement"). The Fosters are owners of a lot within Lakewood having a common address of 2365 Lakeside Drive, Aurora, DuPage County, Illinois 60504, and having a property index number (PIN) of 07-31-111-010 (the "Premises"), as is reference in and made the subject of the Fence Agreement. Together, Lakewood and the Fosters may be referred to collectively herein as the "Parties."

### Recitals

WHEREFORE, the Fence Agreement is based upon and is a result of certain circumstances and conditions discussed and disclosed as between the Parties, pursuant to which Lakewood has approved, subject to certain conditions, covenants and promises as set forth in the Fence Agreement, the Fosters' installation of a fence on the Premises that is and/or, but for the Fence Agreement would be, out of compliance with applicable provisions in Lakewood's recorded Covenants, Bylaws and Rules and Regulations (collectively, the "Instruments");

WHEREFORE, the Fence Agreement, in the form as executed, appears in and is incorporated within and as part of certain written correspondence from counsel for Lakewood to the Fosters, dated May 10, 2020, copies of which were, as of the date executed, in the possession of each of the Parties, and copies of which it is reasonably anticipated that each of the Parties will keep and maintain. By signing the Fence Agreement, the Fosters agreed that same would be recorded against the Premises. The purpose of this Memorandum, including the attached Exhibit "A" hereto, is to provide notice of the provisions of the Fence Agreement to all persons, including purchasers and/or potential purchasers and/or transferees of the Premises, who have/may have reason and/or interest in having knowledge of same. However, because certain facts and circumstances that form(ed) the basis for the Fence Agreement are of a personal and/or privileged nature with respect to the Fosters such that the Association in fairness asserts that they should be

Page **1** of **4**

4825-9312-7382, v. 2

kept from the public record, same have been and are redacted from the copy of Exhibit "A" attached hereto. Based upon this interest in avoiding disclosure of certain information, the copy of the Fence Agreement attached hereto as Exhibit "A" is redacted to the minimum reasonable extent necessary to keep the confidential information from the public record, but to give notice of all relevant terms of the Fence Agreement affecting and burdening the Premises;

WHEREFORE, on or about September 23, 2020, counsel for Lakewood sent to the Fosters, pursuant to the Fence Agreement, a proposed memorandum of agreement for their execution prior to the recording of same in the public records of DuPage County, Illinois, in order that third parties may have notice of the Fence Agreement and of certain terms, conditions and restrictions therein which apply to and affect the Premises and the rights of Lakewood to enforce such terms, conditions and restrictions pursuant to the Fence Agreement's express terms. The Fosters have to date failed and/or refused to execute and/or acknowledge the referenced memorandum of agreement, despite having executed the Fence Agreement to which it pertains. The Fence Agreement executed by the Fosters expressly provides for its recording against the Premises; and

WHEREFORE, Lakewood has been advised/determined that the Fosters have put the Premises up for sale and/or have listed same for sale with the intent to sell and/or transfer the Premises and/or an interest in the Premises, as is referenced in the Fence Agreement and as will trigger or has triggered the application of certain terms in the Fence Agreement that affect or will affect the appearance and existence of certain improvements on the Premises, to wit: the perimeter fencing;

NOW THEREFORE, the Association states as follows for its recorded Memorandum:

## Memorandum

1.      In consideration of the terms and mutual covenants of the Parties set forth in the Fence Agreement (Exhibit "A"), Lakewood does hereby incorporate the above-stated preamble and Recitals by reference as if fully set forth herein and execute and set forth for the public record the terms of this Memorandum applicable to and enforceable in favor of and/or against Lakewood, the Fosters and the Premises, espectively, as set forth more fully in Exhibit "A" hereto.

2.      Notwithstanding terms and requirements of the Instruments that might otherwise be considered to prohibit same, the Fosters have been permitted to install fencing on the sides and rear lot lines of the Premises that is up to six (6) feet in height, which: (i) is all manufactured by the same company; (ii) is consistent in style and appearance (but for side fencing being solid and rear fencing being 'open'); (iii) is made of the same materials; (iv) is all the same color; and (v) all has the same finish.

3.      The referenced fencing was required to be installed (and to the extent same is already installed, Lakewood acknowledges that same has been installed) in a professional and workmanlike manner by a licensed and insured fencing contractor and is in compliance with all relevant building codes and installed pursuant to such permits as may be required.

Page **2** of **4**

4825-9312-7382, v. 2

4.    Within thirty (30) days of such time as: the Fosters -- or either of them -- cease to own the Premises, whether through conveyance, death, or any other reason; anyone is added as an additional owner of the Premises; the condition(s) -- or any of them -- based upon which the Fence Agreement was executed, as are stated therein, no longer exist or apply; then the fence as described in paragraph 1 above must be wholly removed; with the proviso that the Association shall in that event pay the reasonable expense of removal of the fence (but not its replacement); and that the Fosters shall pay the reasonable expense of restoring the ground and/or landscaping affected by such removal and/or the cost of replacing the fence upon conditions as set forth in paragraph 5 below, if they desire to do so.

5.    It is the intent and purpose of the Fence Agreement and this Memorandum that no purchaser or transferee of the Premises, or any interest therein, from the Fosters or either of them shall have, claim, or assert any right to keep the fence described in Paragraph 1 above, upon the happening of any event stated in Paragraph 3, above, but that the Fosters and/or any purchaser or transferee of the Premises, or any interest therein, from the Fosters or either of them only have the right to keep and maintain on the Premises the referenced fence subject to the terms of the Fence Agreement.

6.    In the event, following removal of the referenced fence as provided in Paragraph 3 above, the Fosters or any transferee or purchaser of the Premises, or intended transferee or purchaser of the Premises from the Fosters, or either of them, wish to replace the Subject Fence with fencing that is consistent with the requirements stated in Lakewood's Instruments, the Fosters or such transferee or purchaser must first make submission of same to the Board for prior approval, which approval shall not be unreasonably withheld.

6.    Incorporation of Fence Agreement Terms by Reference.    All    terms,    conditions, provisions and covenants of the Fence Agreement (Exhibit "A") are incorporated in this Memorandum by reference as though written out at length herein. In the event of any inconsistency between the provisions of this Memorandum and those of the Fence Agreement, the provisions of the Fence Agreement shall control. Copies of the Fence Agreement have been provided to both Lakewood and the Fosters at their respective addresses/places of business.

IN WITNESS WHEREOF, Lakewood has caused this Memorandum to be executed by its duly authorized representative as of the date first above written.

Lakewood Improvement Association

By _Adria Pyrz_
        (signature)
_Adria Pyrz_
        (printed name)
Its _President_

_____
        Notary Public
_06-01-2024_
My Commission Expires

ERIN TRYON
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
June 01, 2024

4825-9312-7382, v. 2

## P.I.N. LIST

**Street Address**                                                                **PIN**

2365 Lakeside Drive, Aurora,                                          07-31-111-010
DuPage County, Illinois 60504

4825-9312-7382, v. 2

## LEGAL DESCRIPTION

LOT 1 IN BLOCK 1 IN SUBDIVISION-UNIT 12, A PART OF FOX VALLEY VILLAGES-REGION II, BEING A SUBDIVISION OF PART OF THE SOUTHWEST 1/4 OF SECTION 30 AND PART OF THE NORTHWEST 1/4 OF SECTION 31, TOWNSHIP 38 NORTH, RANGE 9, EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED JUNE 13, 1978 AS DOCUMENT R78-52291 AND CERTIFICATE OF CORRECTION RECORDED JULY 24, 1978 AS DOCUMENT R78-67701, IN DUPAGE COUNTY, ILLINOIS.



**RATHJE WOODWARD** LLC

630-668-8500
Fax: 630-668-9218
jarrigo@rathjewoodward.com
Direct: 630-510-4919

May 1, 2020

**VIA EMAIL**
**REGULAR MAIL and CERTIFIED MAIL**
**#9314869904300071132116 (Return Receipt Requested)**

Mr. and Mrs. Julie and Kevin Foster
2365 Lakeside Drive
Aurora, IL 60504
*(julie.akana@gmail.com)*

> **RE:** **Response on Behalf of Board of Directors of Lakewood Improvement Association to Request from Homeowners Julie and Kevin Foster for Approval of a Non-Conforming Fence at 2365 Lakeside Drive, Aurora, Illinois as a Reasonable Accommodation.**

Dear Mr. and Mrs. Foster:

I represent the Lakewood Improvement Association (the "Association") and its duly-elected Board of Directors (the "Board"). I am advised that you, Kevin and Julie Foster (the "Lot Owners") recently purchased property in the Association with a common address of 2365 Lakeside Drive, Aurora, IL 60504, PIN no. 07-31-111-010 (the "Premises"). I am writing to you for the Association in response in regard to your recent request that the Board grant you an accommodation on behalf of ███████████████, to approve installation of a six (6) foot tall privacy fence on a portion of the Premises.

*Association Instruments*

In this correspondence, I will at times refer to the following Association Instruments: (1) the "Declaration of Covenants, Conditions and Restrictions for Lakewood at Fox Valley Villages," recorded in the Office of the DuPage County Recorder of Deeds as document no. R1978-074667 (the "Declaration"); (2) the "By-Laws of Lake Improvement Association" (the "Bylaws"); and (3) the "Lakewood Improvement Association Fence Guidelines (revised fall 2004)" (the "R & Rs")(together, the "Governing Instruments"). Your deed acknowledges that that Premises is subject to the Declaration and, pursuant to the Declaration's terms, the Association's Board is granted authority to adopt rules and regulations, make decisions regarding application of their provisions to the Association property and enforce the Governing Instruments in the interests of the entire Association and all of its members.

**Exhibit "A"**

Mr. and Mrs. Julie and Kevin Foster
May 1, 2020
Page 2

Article VI, Section 1 of the Declaration ("Architectural Controls" regarding "Fences, Walls and Other Structures") states that "no building, fence wall or other structure shall be erected or maintained upon the Property except such as are installed or approved . . . pursuant to Section 3 below." The referenced Section 3 states, in pertinent part, that "[i]f an Owner desires to . . . construct a . . . fence . . . upon his Lot, then such Owner shall submit plans and specification showing the nature, kind, height, shape, material and location of same to the Board . . . ." "The Board . . . shall consider any such request on the basis of its harmony of external design and location in relation to surrounding structures and topography." The bases upon which the Board determines whether plans submitted satisfy the referenced requirements of Article VI requires that the Board in turn apply pertinent provisions of the Association's R & Rs.

The R & Rs state, in pertinent part, that "[a]n important element in the overall appearance of any Subdivision is the adoption of uniform standards with regard to fences." The R & Rs further specify criteria as to height and styles applicable to various materials from which permitted fences may be constructed, specifically wood, vinyl, ornamental aluminum and wrought iron. (I am advised that you have previously been provided copies of applicable provisions of the R & Rs.) According to the R & Rs, with the exception of fencing on property lines facing the subdivision perimeter (such as adjacent public roads), no solid fencing is permitted, nor can any portion of fencing exceed forty-eight inches (48"/ four feet) in height. Only fences on certain perimeter boundaries may be up to six feet (6') in height and/or be solid fencing. The lone exception within the Association is a lot having a six foot fence surrounding a back yard swimming pool, as mandated by local ordinances and State law.

*Requested Accommodation*
I am advised by the Association, based upon documents that ███████████ has a disability and ████ physician has specified that fencing around the back yard of the Premises would be beneficial and appropriate to provide ███████████ security/containment. According to a revised email communication from Dr. Nisha C. Kakodkar and the drawing of proposed fencing (in the form of a "Proposal and Contract" from Classic Fence, Inc.) that you have submitted to the Board, it is the Board's understanding that you are requesting the Board's approval to install six (6) foot tall solid fencing along the side lot lines and, potentially, six (6) foot tall "open" fencing on the rear lot line surrounding the back yard of the Premises (including solid fencing extending from the side lot lines to approximately the rear elevation of the existing residence) (together, the "Subject Fence"). Based upon the provisions cited above, you are or should be aware that the Subject Fence as proposed is inconsistent with the Association's existing architectural requirements in several respects, including the proposed height and the closed fencing style described.

The Association is nonetheless mindful that certain provisions of the federal Fair Housing Act require entities such as the Association to make reasonable accommodations upon request by/on behalf of persons having what meets the statutory definition ██████ in the application of their Governing Instruments, if doing so will not impose an undue administrative burden or fundamentally alter its nature. The Board must also take into account its statutory and legal duties to consistently enforce its Governing Instruments on behalf of and for the benefit of all Association

Mr. and Mrs. Julie and Kevin Foster
May 1, 2020
Page 3

members. Therefore, in consideration of the referenced statutes and the duties and obligations described, the Association's Board has authorized me to communicate the following proposed agreement:

*Proposed Agreement*

As a reasonable accommodation of ███████████████████ as referenced above and upon your acceptance of the terms set forth below, which in no way alter the physical attributes of the Subject Fence as submitted to the Board for its approval, the Board will agree to approve construction of the Subject Fence on the Premises as described, subject to the following terms/requirements:

A.      The fencing on the sides and rear lot lines must (i) be manufactured by the same company, (ii) be consistent in style and appearance (but for side fencing being solid and rear fencing being 'open'), (iii) be made of the same materials, (iv) be the same color and (v) all have the same finish; and

B.      The Subject Fence must be installed in a professional and workmanlike manner by a licensed and insured fencing contractor (such insurance being for the protection of the Association, its property and members); and

C.      Prior to installation of any fencing, Lot Owners and/or their contractor shall notify the Illinois "One-Call" service (J.U.L.I.E.) to have all utilities within the area on which construction will take place located and marked; and

D.      Prior to the commencement of work to install the Subject Fence, you must confirm that the fence and its installation are in compliance with all relevant building codes and that any required permits have been applied for, issued and displayed; and

E.      Within thirty (30) days of such time as Lot Owners', or either of them, ceasing to own the Premises, whether by conveyance, death, or any other reason, or of anyone being added as an additional owner of the Premises, or upon the ████████████████████ the fence as described above must be wholly removed; with the proviso that the Association shall in that event pay the reasonable expense of removal of the fence (but not its replacement); and that The Owners shall pay the reasonable expense of restoring the ground and/or landscaping affected by such removal and/or the cost of replacing the fence, if any;

F.      In the event Lot Owners wish to replace the Subject Fence with fencing that is consistent with the requirements stated in the R & Rs, you must first make submission of same to the Board for prior approval, which approval shall not be unreasonably withheld; and

G.      Upon execution by Lot Owners of a written instrument setting forth the terms herein and execution of same by the Board's authorized representative pursuant to the affirmative vote of a majority of a quorum of the Board approving same, including via counterparts, a copy of such written instrument or a memorandum thereof shall be recorded by the Association in the Office of the DuPage County Recorder of Deeds.

4853-0032-7099, v. 2

Mr. and Mrs. Julie and Kevin Foster
May 1, 2020
Page 4

It is my understanding that you have previously opposed the requirement that you remove the Subject Fence upon sale of the Premises or ███████████████████████. As noted above, however, the Association asserts that permitting the Subject Fence to remain under those circumstances would essentially allow the variance from Association R & Rs that the Subject Fence represents to 'run with the land,' and be taken advantage of by later occupants/owners ███. The stated purposes of the Declaration's and R & Rs' provisions requiring compliance with fence requirements to secure approval (but-for the existence of ███████ for which accommodation should be made) are "secure an attractive and harmonious development," based upon "harmony of external design," and to "maintain[ ] a high quality overall appearance of property within the Subdivision" by application of "uniform standards with regard to fences." Such circumstances would weaken the Governing Instruments and result in their inconsistent application to property and members of the Association. Further, the terms of applicable provisions of the Fair Housing Act do not outlaw provisions requiring restoration of the property within the Association when the accommodation is no longer required for the purpose for which it was sought: to provide an equal opportunity to use and enjoy a dwelling.

On behalf of the Board, I look forward to receiving your response and your anticipated agreement to the reasonable terms stated above, which you may also signal by your signature in the spaces provided below.

Sincerely,
RATHJE WOODWARD LLC
*James P. Arrigo*
James P. Arrigo

JPA/elm
Cc:   Bd. of Directors  (via email)

By the Lot Owners:

AGREED: _Kevin Foster_
Kevin Foster

AGREED: _Julie Foss_
Julie Foster

4853-0032-7099, v. 2

# Exhibit G



**PRAIRIE STATE LEGAL SERVICES**

February 27, 2026

**VIA EMAIL**

Scott E. Pointner, Esq.
Attorney for Candlewick Lake Association
Rathje Woodward LLC
300 E. Roosevelt Rd., Suite 220
Wheaton, IL 60187
spointner@rathjelaw.com

**RE:**   *Reasonable Accommodation Request by Nichole Aguanno and Family, Residents of*
*227 Picadilly Dr SE, Poplar Grove, IL 61065*

Dear Scott,

By focusing on aesthetic appearance, the Association has mishandled the Aguannos' reasonable accommodation request.   The Aguannos' reasonable accommodation request should not be conflated with a standard fence request where the Association or Environmental Control Committee decides whether "in its opinion" the fence will "contribute to and be in keeping with the character of the area."

The Fair Housing Act and Illinois Human Rights Act mandate reasonable accommodations to rules, policies, practices, or services when necessary to afford individuals with disabilities equal opportunity to use and enjoy their home. While an "interactive process" is often required and useful after an accommodation request is made, the Association's questions have been improper, and its responses constitute constructive denials of the accommodation request.

For over 6 months, the Association has unduly delayed granting the Aguannos' simple request by repeatedly requiring additional aesthetic details and claiming that such details are "necessary" in order for it to consider the accommodation request.   Not so.   The Association may request additional information only if it is "necessary" to establish either:  the existence of a disability; or, the disability-related need for a fence. Neither is at issue here.

There is no dispute that the Aguannos' 5-year-old children have a disability.  The children have been diagnosed with autism.  There is also no dispute that the children have a disability-related need for a reasonable accommodation.  The children's disability increases their propensity to dangerously elope.  Playing in the backyard without a fence currently places the children at heightened risk.   Thus, the Aguanno family's request to build a fence as a reasonable accommodation is straightforward.

**PURSUING JUSTICE. RESTORING HOPE.**

ROCKFORD OFFICE
303 North Main St., Ste 600
Rockford, IL 61101

PHONE 815.965.2902
EMAIL info@pslegal.org
pslegal.org

Jesse Hodierne MANAGING ATTORNEY

 LSC | America's Partner for Equal Justice
LEGAL SERVICES CORPORATION

 United Way
Community Partner

Still, the Aguannos have at all times been willing to coordinate to reduce or appease the Association's aesthetic concerns. The family's initial request even included four proposed designs (including photos, materials, dimensions) and a proposed location for the fence. This initial request contained enough information to approve the *reasonable accommodation* aspect of this request, and the fence options that were provided show that the Aguannos were willing to defer to the Association on what the design/material of the fence would be. Yet, the Association continues to claim that it cannot approve the reasonable accommodation without the specifics of the fence to be installed.

For the past few months, the Aguannos have further narrowed the fence options down to two choices for the Association to choose from in hopes that this will be resolved quickly and amicably. Do not attempt to misconstrue the Aguannos' exceedingly cooperative approach as some tacit acknowledgment that their requests have been deficient or lacked necessary detail.

Those options are attached to this response, with renderings provided by the proposed contractor that show the location of the fence. In the spirit of their continued cooperation:

    a. Location: Backyard, well within the lot perimeter
    b. Distance from boundary: Varying distances due to the shape of the property.
    c. Height: The fence will be 5ft tall.
    d. Materials: Aluminum or composite materials.
    e. See-Through: Yes, if aluminum; no, if composite.
    f. Contractor: ReVamp Fence & Deck

Additionally, the Aguannos are willing to agree to have the fence removed in the future, should they choose to move out of Candlewick Lake. Please review the attached materials with the Association, and include its preferred materials along with its approval of the Aguannos' reasonable accommodation request. **Since we are entering the busy season for contractors, please provide an approval to this request by March 13, 2026 so that the Aguannos can get a contract signed and work scheduled so that they can avoid any further delay.**

Thank you,

Tessa Skogh
Attorney at Law



**CONTRACT**

| Prepared for: | February 11, 2026 | No. 63844 |
|---|---|---|
| Nicole & Christopher Aguanno<br>227 Picadilly Dr SE<br>Poplar Grove, IL 61065<br>▮▮▮▮▮▮ | Revamp Fence & Deck - Freeport \| Robert Martinez<br>29 E. Stephenson St., Freeport, IL 61032<br>P: (844) 209-9843 \| r.martinez@revampfence.com<br>www.revampfence.com | |

## Summary

**As our valued customer, we want to be sure you have complete information about the installation of your fence, railing or deck and are in agreement with our installation methods and our right to access your property. Our goal is to avoid problems and provide a quick, quality installation service with great communication.**

**1.** There are some underground items that only the homeowner can identify. The utility companies do not mark these and the installation professional is not responsible for damage to any unmarked items.

   **a.** Underground Sprinkler Lines, Underground Water Lines, Underground Electric, French Drains or any electrical, water or cable locations where your utilities in your city do not provide marking services.

**2.** Homeowner is responsible for the location of the fence. If you cannot find the property line markers it is recommended that you have a survey done. We are not responsible for the costs of moving or removing fences where the property line has not been properly located.

**3.** Our install team will need access to an exterior electrical outlet and a water faucet. Please secure all pets prior to our installation teams arrival.

**4.** We do request that you be present at the start of the installation. Typically our crews arrive between 7am-9am.

**5.** Our company is not responsible for any damage or soiling to driveways, walkways, walls, gardens, fresh grading sod, shrubbery, patios, etc. resulting from gaining access or performing work in the same proximity.

**6.** While digging postholes of at least two feet we may encounter a hard dig condition. Hard dig is the use of a jackhammer or auger outside of our normal no dig system. There is a $150 charge per hard dig hole.

**7.** Our company is not responsible for ground settling for any reason. Settling is commonly caused by high underground water tables, poor drainage, inadequate backfill at the time of construction, and loose non-compacted soil.

**8.** Payment Terms upon signing the contract are 40% down. The remaining balance of 60% is due the day of the installation.

**9.** Our company is not responsible for drilling into unknown unstable concrete during a railing, fence or deck installation.

**10.** See Gate Warranty

**11.** Home Owner agrees to allow before and after pictures for use of marketing purposes.

**12.** Call 844-4FENCENOW for any service related questions.

**13.** Customer understands that all deposits are non-refundable beyond the 3 day right of recission due to fabrication and manufacture of the fence, deck, or railing beginning.

**14.** In the event any balance is referred to collections or an attorney who is not a full-time employee of the company, the customer agrees to pay the costs of the collection and/or reasonable attorney fees.

# Black Aluminum Fencing



## Black Aluminum Fencing

**Quantity**

1

**Measurement**

189 (Linear Ft)

**Notes**

CASH DISCOUNT- $13,000. 40% DOWN- $5,200 DOWN. REST UPON COMPLETION

DISCOUNT WITH FINANCING- $13,600 WITH $1,000 DOWN- $209 A MONTH- 7 YEAR 9.99%

Footage:
Color:
Finance Company Used:
County/Township:

Msc Notes:
*Plat Survey*
A majority of fence permits will require a plat survey as well as a site plan.  If you do not have a plat survey we can obtain a new survey for your property at a cost of $1500.  Expect a permit and project delay if you do not have your plat survey at the time of sale.

**Fence Color**

Black Aluminum

**Fence Height**

5' FT

**Gates**

2

**Gate #1 Size**

Single 48"

**Gate #2 Size**

Single 48"

**Gate #3 Size**

None

**Gate #4 Size**

None

**Estimated Start Date**

30-60 days pending permit/survey

**Estimated End Date**

30-60 days pending permit/survey

**Lot Type**

Through Lot

**HOA Approval Required**

Yes

**Form of Payment**

ACH/Check/Credit Card

**Finance Company**

N/A

## 002 - Aluminum Line Post



**Quantity**

31

Aluminum Line Post

## 003 - Aluminum Corner Post



**Quantity**
4

Aluminum Corner Post

## 004 - Aluminum End Post



**Quantity**
8

Aluminum End Post

## 006 - Aluminum Single Gate



**Quantity**
2

Aluminum Single Gate

**Gate Size**
Single 48"

## 10 - Upgrade to 5' Height Fence



**Quantity**
1

Upgrade to 5' Height Fence

**Price:** ~~$15,339.00~~  $13,000.00

# Discounts

## 60% OFF Installation



**Discount**

15.00%

## Variable Incentive



**Discount**

$38.15

## Pricing

| | |
|---|---|
| Subtotal: | $15,339.00 |
| Discount: | $2,339.00 |
| **Grand Total:** | **$13,000.00** |
| Deposit Amount: | $5,200.00 |
| Balance Due: | $7,800.00 |

All applicable discounts and promos have been applied.
Projects cancelled/rescheduled without a 14 day a will have a $500 fee applied and will not be rescheduled until paid
No changes can be made to scope of work within 14 days of estimated install date.
Changes made to project inside 14 days of install will have a $500 fee applied.
Non-Refundable Deposit due upon signing. Balance due upon completion

Please initial next to the following statements to indicate that you have read, understand, and agree to them:

The customer understands that they are responsible for any permitting required for a fence or deck project on their property.  All municipalities are different and it is the customers responsibility to determine if they need one.                                                                     _____

All fences are custom built and cancellations beyond the normal 3 day right of recission will not be accepted.  Furthermore all deposits are non-refundable and the customer will be responsible for up to 50% of the contracted cost of the project beyond the 3-day right of recession.                      _____

I agree that the payment method used for my deposit payment may be securely kept on file to process the final payment for the remaining balance due immediately upon job completion. I understand that it is recommended that I, or someone else that I designate, be present at the job site upon completion to inspect and ensure everything is completed to my satisfaction. If nobody is present upon job completion, payment will still be processed for the remaining balance.                                    _____

We have the right to move/adjust the project up to 18.5" to 24.5" based on where the utility markings are as required by state law.                                                                           _____

Private utility lines on a homeowners property not owned and maintained by the utility companies will not be marked.  Example of this would private gas lines to a grill or electricity to a detached garage." It is the home owners responsibility to mark any private utility lines.  Revamp Companies Brands will not be responsible for the lines or any damage caused to them.                                      _____

If Revamp Fence & Deck is pulling the permit on behalf of the customer, the customer gives consent to Revamp Fence & Deck to sign on behalf of said customer for any permit application requirements.          _____

**WARRANTY**

**The warranty of the project: Residential Limited Lifetime Warranty**
The Revamp Companies Fence & Deck system warrants their rigid vinyl extrusions to be the finest quality available and to be superior for exterior fence and railing applications. Revamp warrants that their rigid vinyl extrusions will not chip, peel, blister, rot or corrode when used in accordance with Revamp fabrication, installation, care & maintenance instructions and guidelines.

Revamp does not warrant against normal weathering conditions. Normal weathering will cause any surface to gradually fade or darken. Normal weathering includes, but is not limited to, color change (uniform fading), impact reduction and shrinkage.

This warranty is for the lifetime of the product from the date of manufacture and is non-transferable. Should any defective material be found during the warranty period, Revamp will replace the defective material. Warranty does not apply to parts and accessories such as caps, hinges, latches, support posts.

**Exclusions: Solar Lights**
Solar Lights have a 1-year warranty from the original date of the contract. All other warranty or services on solar lights will need to be directed to LMT-MERCER GROUP. Please change the battery prior to calling for warranty service or purchasing a new one.

**WI RESIDENTS NOTICE OF LIEN RIGHTS:**
As required by the Wisconsin Construction Lien Law, claimant hereby notifies owner that persons or companies performing, furnishing, or procuring labor, services, materials, plans or specifications for the construction on owner's land may be lien rights on owner's land and buildings if not paid. Those entitled to lien rights, in addition to the undersigned claimant, are those who contract directly with the owner or those who give the owner notice within 60 days after they first perform, furnish, or procure labor, services, materials, plans or specifications for the construction. Accordingly, owner probably will receive notices from those who perform, furnish, or procure labor, services, materials, plans or specifications for the construction, and should give a copy of each notice received to the mortgage lender, if any. Claimant agrees to cooperate with the owner and the owner's lender, if any, to see that all potential lien claimants are duly paid.

**IA RESIDENTS NOTICE OF LIEN RIGHTS:**
Persons or companies furnishing labor or materials for the improvement of real property may enforce a lien upon the improved property if they are not paid for their contributions, even if the parties have no direct contractual relationship with the owner. The mechanics' notice and lien registry provides a listing of all persons or companies furnishing labor or materials who have posted a lien or who may post a lien upon the improved property.
The state construction registry can be found at: https://sos.iowa.gov/mnlr/search/search.aspx. The toll-free telephone number for the state construction registry is: 1-888-767-8683.

**Applies to all Backyard Vinyl, Revamp Fence & Deck, and The Vinyl Outlet Locations**

X _____       X _____
Nicole & Christopher Aguanno                     Company Authorized Signature



-Limit 1 per customer.
-Must be claimed after installation is complete and project is paid in full.
-Delivered via email only.
-Must be installed within 90 days

After installation is complete claim your gift card at
www.revampcompanies.com/giftcard

Gift Card will be delivered via TEXT MESSAGE
within 45 days after submission.



# CONTRACT

| **Prepared for:** | **February 11, 2026** | **No. 63849** |
| --- | --- | --- |
| Nicole & Christopher Aguanno<br>227 Picadilly Dr SE<br>Poplar Grove, IL 61065<br>▇▇▇▇▇▇▇ | Revamp Fence & Deck - Freeport \| Robert Martinez<br>29 E. Stephenson St., Freeport, IL 61032<br>P: (844) 209-9843 \| r.martinez@revampfence.com<br>www.revampfence.com | |

## Summary

**As our valued customer, we want to be sure you have complete information about the installation of your fence, railing or deck and are in agreement with our installation methods and our right to access your property. Our goal is to avoid problems and provide a quick, quality installation service with great communication.**

**1.** There are some underground items that only the homeowner can identify. The utility companies do not mark these and the installation professional is not responsible for damage to any unmarked items.

   **a.** Underground Sprinkler Lines, Underground Water Lines, Underground Electric, French Drains or any electrical, water or cable locations where your utilities in your city do not provide marking services.

**2.** Homeowner is responsible for the location of the fence. If you cannot find the property line markers it is recommended that you have a survey done. We are not responsible for the costs of moving or removing fences where the property line has not been properly located.

**3.** Our install team will need access to an exterior electrical outlet and a water faucet. Please secure all pets prior to our installation teams arrival.

**4.** We do request that you be present at the start of the installation. Typically our crews arrive between 7am-9am.

**5.** Our company is not responsible for any damage or soiling to driveways, walkways, walls, gardens, fresh grading sod, shrubbery, patios, etc. resulting from gaining access or performing work in the same proximity.

**6.** While digging postholes of at least two feet we may encounter a hard dig condition. Hard dig is the use of a jackhammer or auger outside of our normal no dig system. There is a $150 charge per hard dig hole.

**7.** Our company is not responsible for ground settling for any reason. Settling is commonly caused by high underground water tables, poor drainage, inadequate backfill at the time of construction, and loose non-compacted soil.

**8.** Payment Terms upon signing the contract are 40% down. The remaining balance of 60% is due the day of the installation.

**9.** Our company is not responsible for drilling into unknown unstable concrete during a railing, fence or deck installation.

**10.** See Gate Warranty

**11.** Home Owner agrees to allow before and after pictures for use of marketing purposes.

**12.** Call 844-4FENCENOW for any service related questions.

**13.** Customer understands that all deposits are non-refundable beyond the 3 day right of recission due to fabrication and manufacture of the fence, deck, or railing beginning.

**14.** In the event any balance is referred to collections or an attorney who is not a full-time employee of the company, the customer agrees to pay the costs of the collection and/or reasonable attorney fees.

## Privacy Fence



### Privacy Fence

| Quantity | Measurement |
|---|---|
| 1 | 189 (Linear Ft) |

**Notes**

Discount with financing- $13,000 with $1,000 down- 7 year 9.99%- $200 a month

Footage:
Color:
Finance Company Used:
County/Township:

Msc Notes:
*Plat Survey*
A majority of fence permits will require a plat survey as well as a site plan. If you do not have a plat survey we can obtain a new survey for your property at a cost of $1500. Expect a permit and project delay if you do not have your plat survey at the time of sale.

| Fence Style | Post Color | Rail Color |
|---|---|---|
| Privacy | White | White |

| Post Cap Color | In-Fill Panel | Post Cap Style |
|---|---|---|
| White | White | Horse Cap |

| Number of Gates | Picket Top Color | Fence Height |
|---|---|---|
| 2 | N/A | 6 Feet |

| Estimate Start Date | Estimate End Date | HOA Approval Required |
|---|---|---|
| 30-60 days pending permit/survey | 30-60 days pending permit/survey | Yes |

| Lot Type | Form of Payment | Finance Company |
|---|---|---|
| Through Lot | ACH/Check/Credit Card | N/A |

## 02 - Line Post

**Quantity**
27

Line Post

## 03 - Corner Post



**Quantity**
4

Corner Post

## 04 - End Post



**Quantity**
8

End Post

## 06 - Single Gate



**Quantity**
2

Single Gate

**Selected Option**
Single 48"

**Price:** ~~$14,683.00~~ $12,480.55

## Discounts

### 60% OFF Installation



**Discount**

15.00%

## Pricing

| | |
|---|---|
| Subtotal: | $14,683.00 |
| Discount: | $2,202.45 |
| **Grand Total:** | **$12,480.55** |
| Deposit Amount: | $4,992.22 |
| Balance Due: | $7,488.33 |

All applicable discounts and promos have been applied.
Projects cancelled/rescheduled without a 14 day a will have a $500 fee applied and will not be rescheduled until paid
No changes can be made to scope of work within 14 days of estimated install date.
Changes made to project inside 14 days of install will have a $500 fee applied.
Non-Refundable Deposit due upon signing. Balance due upon completion

Please initial next to the following statements to indicate that you have read, understand, and agree to them:

The customer understands that they are responsible for any permitting required for a fence or deck project on their property. All municipalities are different and it is the customers responsibility to determine if they need one.

_____

All fences are custom built and cancellations beyond the normal 3 day right of recission will not be accepted. Furthermore all deposits are non-refundable and the customer will be responsible for up to 50% of the contracted cost of the project beyond the 3-day right of recession.

_____

I agree that the payment method used for my deposit payment may be securely kept on file to process the final payment for the remaining balance due immediately upon job completion. I understand that it is recommended that I, or someone else that I designate, be present at the job site upon completion to inspect and ensure everything is completed to my satisfaction. If nobody is present upon job completion, payment will still be processed for the remaining balance.

_____

We have the right to move/adjust the project up to 18.5" to 24.5" based on where the utility markings are as required by state law.

_____

Private utility lines on a homeowners property not owned and maintained by the utility companies will not be marked. Example of this would private gas lines to a grill or electricity to a detached garage." It is the home owners responsibility to mark any private utility lines. Revamp Companies Brands will not be responsible for the lines or any damage caused to them.

_____

If Revamp Fence & Deck is pulling the permit on behalf of the customer, the customer gives consent to Revamp Fence & Deck to sign on behalf of said customer for any permit application requirements.

_____

**WARRANTY**

**The warranty of the project: Residential Limited Lifetime Warranty**
The Revamp Companies Fence & Deck system warrants their rigid vinyl extrusions to be the finest quality available and to be superior for exterior fence and railing applications. Revamp warrants that their rigid vinyl extrusions will not chip, peel, blister, rot or corrode when used in accordance with Revamp fabrication, installation, care & maintenance instructions and guidelines.

Revamp does not warrant against normal weathering conditions. Normal weathering will cause any surface to gradually fade or darken. Normal weathering includes, but is not limited to, color change (uniform fading), impact reduction and shrinkage.

This warranty is for the lifetime of the product from the date of manufacture and is non-transferable. Should any defective material be found during the warranty period, Revamp will replace the defective material. Warranty does not apply to parts and accessories such as caps, hinges, latches, support posts.

**Exclusions: Solar Lights**
Solar Lights have a 1-year warranty from the original date of the contract. All other warranty or services on solar lights will need to be directed to LMT-MERCER GROUP. Please change the battery prior to calling for warranty service or purchasing a new one.

**WI RESIDENTS NOTICE OF LIEN RIGHTS:**
As required by the Wisconsin Construction Lien Law, claimant hereby notifies owner that persons or companies performing, furnishing, or procuring labor, services, materials, plans or specifications for the construction on owner's land may be lien rights on owner's land and buildings if not paid. Those entitled to lien rights, in addition to the undersigned claimant, are those who contract directly with the owner or those who give the owner notice within 60 days after they first perform, furnish, or procure labor, services, materials, plans or specifications for the construction. Accordingly, owner probably will receive notices from those who perform, furnish, or procure labor, services, materials, plans or specifications for the construction, and should give a copy of each notice received to the mortgage lender, if any. Claimant agrees to cooperate with the owner and the owner's lender, if any, to see that all potential lien claimants are duly paid.

**IA RESIDENTS NOTICE OF LIEN RIGHTS:**
Persons or companies furnishing labor or materials for the improvement of real property may enforce a lien upon the improved property if they are not paid for their contributions, even if the parties have no direct contractual relationship with the owner. The mechanics' notice and lien registry provides a listing of all persons or companies furnishing labor or materials who have posted a lien or who may post a lien upon the improved property.
The state construction registry can be found at: https://sos.iowa.gov/mnlr/search/search.aspx. The toll-free telephone number for the state construction registry is: 1-888-767-8683.

**Applies to all Backyard Vinyl, Revamp Fence & Deck, and The Vinyl Outlet Locations**

X _____
Nicole & Christopher Aguanno

X _____
Company Authorized Signature



-Limit 1 per customer.
-Must be claimed after installation is complete and project is paid in full.
-Delivered via email only.
-Must be installed within 90 days

After installation is complete claim your gift card at
www.revampcompanies.com/giftcard

Gift Card will be delivered via TEXT MESSAGE
within 45 days after submission.











Property Line